**AUTOGIRO COMPANY OF AMERICA**

v.

**The UNITED STATES.**

No. 50328.

United States Court of Claims.

Oct. 13, 1967.

Cowen, C. J., and Collins, J., dissented in part.

J. Edward Shinn, Philadelphia, Pa., attorney of record, for plaintiff, Synnestvedt & Lechner, Raymond H. Synnestvedt, Philadelphia, Pa., and C. Willard Hayes, Washington, D. C., of counsel.

Acting Asst. Atty. Gen. J. William Doolittle, for defendant, Francis H. Fassett, Alexandria, Va., and Howard B. Rockman, Silver Spring, Md., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

OPINION *

DURFEE, Judge.

The *Autogiro Company of America*, a Delaware corporation owning all patents involved in this litigation, sues, under 28 U.S.C. § 1498,[1] to recover the "reasonable and entire compensation" for the Government's allegedly unauthorized use of its patented inventions. Only the question of liability is now before the court. The determination of any amount of recovery is reserved for further proceedings before the trial commissioner.

Plaintiff initiated suit in this court on September 21, 1951, with a Petition Pending Motion for Call which claimed the infringement of twenty-six patents. The petition was amended on March 10, 1954; twelve patents were dropped from the suit and six were added. Four years of pre-trial proceedings reduced the number of patents to sixteen. During that period, fourteen witnesses appeared, over one thousand exhibits were presented, and almost fifteen thousand pages of transcript were taken. The trial commissioner issued a 232-page report containing 415 findings of fact. Fifteen of the sixteen patents in suit and eighty-five of their eighty-six claims in suit were found valid and infringed by various Government structures. One patent and its one claim were found not infringed.

Plaintiff has not excepted to any findings of fact. Defendant has excepted to findings concerning the fifteen patents found valid and infringed. We find claims of eleven patents to be valid and infringed.

### Patent Infringement

Like many patent infringement suits, this case presents no novel legal questions. Absent are any issues not found in the run-of-the-mine case. This does not mean that the law involved should go unstated. The complexity of the inventions in suit, the length of the trial, and basic disagreement of the parties on legal issues are considerations that dictate a recital of this court's law of patent infringement.

I

The Patent Act of 1952, 35 U.S.C. § 1 et seq., which applies to all patents granted on or before January 1, 1953,[2] is the controlling law in this case. No previous patent act contained a section on infringement. Congress had always allowed the courts to settle the issue without any legislative guidelines. Rich, Infringement Under Section 271 of the Patent Act of 1952, 21 Geo.Wash.L.Rev. 521 (1953). Section 271(a)[3] which covers the type of infringement alleged here was not inserted in the Act to clarify any legal problems, but only as a codification of existing judicial determinations. As one commentator has stated: "We got along without it for 162 years and we could again. Its omission would change nothing." Id. at 537.

The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which "particularly [point] out and distinctly [claim] the subject mat-

* At the direction of the court, Trial Commissioner Donald E. Lane prepared an opinion which has been of substantial assistance.

1. 28 U.S.C. § 1498 states in part:
 "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

See Western Electric Co. v. Hammond, 135 F.2d 283 (1st Cir. 1943).

2. Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 536 (2d Cir. 1955), cert. denied 350 U.S. 911, 76 S.Ct. 193, 100 L. Ed. 799; Fairchild Engine & Airplane Corp. v. United States, 285 F.2d 131, 152 Ct.Cl. 352 (1961).

3. Section 271(a) states: "Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."

ter which the applicant regards as his invention." 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement.[4] Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth.[5] No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them. Although courts are confined by the language of the claims, they are not, however, confined to the language of the claims in interpreting their meaning.

Courts occasionally have confined themselves to the language of the claims. When claims have been found clear and unambiguous, courts have not gone beyond them to determine their content. Keystone Bridge Co. v. Phoenix Iron Co., supra, 95 U.S. at 278, 24 L.Ed. 344; Borg-Warner Corp. v. Mall Tool Co., 217 F.2d 850 (7th Cir. 1954); Zonolite Co. and Insulating Concrete Corp. v. United States, 149 F.Supp. 953, 138 Ct.Cl. 114 (1957). Courts have also held that the fact that claims are free from ambiguity is no reason for limiting the material which may be inspected for the purpose of better understanding the meaning of claims. Warner & Swasey Co. v. Universal Marion Corp., supra, 237 F.Supp. at 737.

We find both approaches to be hypothetical. Claims cannot be clear and unambiguous on their face. A comparison must exist. The lucidity of a claim is determined in light of what ideas it is trying to convey. Only by knowing the idea, can one decide how much shadow encumbers the reality.

The very nature of words would make a clear and unambiguous claim a rare occurrence. Writing on statutory interpretation, Justice Frankfurter commented on the inexactitude of words:

> They are symbols of meaning. But unlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision. If individual words are inexact symbols, with shifting variables, their configuration can hardly achieve invariant meaning or assured definiteness.

Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 528 (1947). See, also, A Re-Evaluation of the Use of Legislative History in the Federal Courts, 52 Col.L.Rev. 125 (1952).

The inability of words to achieve precision is none the less extant with patent claims than it is with statutes. The problem is likely more acute with claims. Statutes by definition are the reduction

---

4. E. g., Yale Lock Mfg. Co. v. Greenleaf, 117 U.S. 554, 6 S.Ct. 846, 29 L.Ed. 952 (1886); Merrill v. Yeomans, 94 U.S. 568, 24 L.Ed. 235 (1876); Keystone Bridge Co. v. Phoenix Iron Co., 95 U.S. 274, 24 L.Ed. 344 (1877); Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 (1935); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940); Sontag Chain Stores Co. Ltd. v. National Nut Co., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204 (1940); Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945); Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942); Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); Aro Mfg. Co. v. Convertible Top Replacement Co.,

365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Perry v. United States, 76 F.Supp. 503, 112 Ct.Cl. 1 (1948); Chesterfield v. United States, 159 F.Supp. 371, 141 Ct.Cl. 838 (1958); Yosemite Chemical Co. v. United States, 360 F.2d 948, 175 Ct.Cl. 623 (1966); Soundscriber Corp. v. United States, 360 F.2d 954, 175 Ct.Cl. 644 (1966).

5. E. g., Brooks v. Fiske, 56 U.S. (15 How.) 212, 14 L.Ed. 665 (1853); White v. Dunbar, 119 U.S. 47 (1886); Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U.S. 399 (1905); Hutzler Bros. v. Sales Affiliates, Inc., 164 F.2d 260 (4th Cir. 1947); Warner & Swasey Co. v. Universal Marion Corp., 237 F.Supp. 719 (D.Colo.1964); Morrill v. Automatic Industries, Inc., 93 F.Supp. 697 (W.D. Mo.1950).

of ideas to print. Since the ability to verbalize is crucial in statutory enactment, legislators develop a facility with words not equally developed in inventors. An invention exists most importantly as a tangible structure or a series of drawings. A verbal portrayal is usually an afterthought written to satisfy the requirements of patent law. This conversion of machine to words allows for unintended idea gaps which cannot be satisfactorily filled. Often the invention is novel and words do not exist to describe it. The dictionary does not always keep abreast of the inventor. It cannot. Things are not made for the sake of words, but words for things. To overcome this lag, patent law allows the inventor to be his own lexicographer. *Chicago Steel Foundry Co. v. Burnside Steel Foundry Co.*, 132 F.2d 812 (7th Cir. 1943); *Stuart Oxygen Co. Ltd. v. Josephian*, 162 F.2d 857 (9th Cir. 1947); *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 137 F.2d 3 (7th Cir. 1943), aff'd 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944).

Allowing the patentee verbal license only augments the difficulty of understanding the claims. The sanction of new words or hybrids from old ones not only leaves one unsure what a rose is, but also unsure whether a rose is a rose. Thus we find that a claim cannot be interpreted without going beyond the claim itself. No matter how clear a claim appears to be, lurking in the background are documents that may completely disrupt initial views on its meaning.[6]

■ The necessity for a sensible and systematic approach to claim interpretation is axiomatic. The Alice-in-Won-derland view that something means whatever one chooses it to mean makes for enjoyable reading, but bad law. Claims are best construed in connection with the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application. *Doble Engineering Co. v. Leeds & Northrup Co.*, 134 F.2d 78 (1st Cir. 1943). In utilizing all the patent documents, one should not sacrifice the value of these references by the "unimaginative adherence to well-worn professional phrases." Frankfurter, supra, at 529. Patent law is replete with major canons of construction of minor value which have seldom provided useful guidance in the unraveling of complex claims. Instead, these canons have only added confusion to the problem of claim interpretation. *Doble Engineering Co. v. Leeds & Northrup, supra*, at 84.

## II

■ In deriving the meaning of a claim, we inspect all useful documents and reach what Justice Holmes called the "felt meaning"[7] of the claim. In seeking this goal, we make use of three parts of the patent: the specification, the drawings, and the file wrapper.

*Specification.*—Section 112 of the 1952 Patent Act requires the specification to describe the manner and process of making and using the patent so that any person skilled in the patent's art may utilize it. In serving its statutory purpose, the specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification. U.S.Pat.Off. Rule 75(d).[8] The use of the

---

6. In *Berkey v. United States*, 361 F.2d 983, 176 Ct.Cl. 1 (1966), a case involving veterans' benefits, a supposedly clear and unambiguous section of a statute read on the surface to bar certain payments to the survivors of an incompetent veteran. The court went below the surface and found that Congressional intent was the opposite of the surface manifestation.

7. *United States v. Johnson*, 221 U.S. 488, 496, 31 S.Ct. 627, 55 L.Ed. 823 (1911).

8. Rule 75(d): "The claim or claims must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description."

specification as a concordance for the claims is accepted by almost every court, and is a basic concept of patent law.[9] Most courts have simply stated that the specification is to be used to explain the claims; others have stated the proposition in different terms, but with the same effect. The following expressions are indicative of this latter approach: (1) " * * * [A] patentee's broadest claim can be no broader than his actual invention." Kemart Corp. v. Printing Arts Research Laboratories, Inc., 201 F. 2d 624, 629 (9th Cir. 1953), (2) " * * [R]ecourse must be had to the specifications to see how far the means there disclosed correspond with those made by the defendant." Perry v. United States, 76 F.Supp. 503, 505, 112 Ct.Cl. 1, 30 (1948); Grubman Engineering & Mfg. Co. v. Goldberger, 47 F.2d 151, 152 (2d Cir. 1931), (3) "[W]hile the specification may be referred to in order to limit the claim, it can never be made available to expand it." Hanovia Chemical & Mfg. Co. v. David Buttrick Co., 39 F.Supp. 646 (D.Mass.1941), aff'd 127 F.2d 888 (1st Cir. 1942).

■ The specification "set[s] forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. This one embodiment of the invention does not restrict the claims. Claim interpretation must not make use of "best mode" terms inasmuch as the patentee need not guard against infringement by listing every possible infringing device in the specification. Adams v. United States, 330 F.2d 622, 165 Ct. Cl. 576 (1964), aff'd 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Grant Paper Box Co. v. Russell Box Co., 154 F.2d 729 (1st Cir. 1946), cert. denied 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 639. But where the specification does not refer to an embodiment or a class of embodiments in terms of "best mode," such reference may be of value in claim interpretation. This would be where the patentee describes an embodiment as being the invention itself and not only one way of utilizing it.

■ *Drawings.*—The patent may contain drawings. 35 U.S.C. § 113. In those instances where a visual representation can flesh out words, drawings may be used in the same manner and with the same limitations as the specification. Permutit Co. v. Graver Corp., 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163 (1931); Cameron Iron Works, Inc. v. Stekoll, 242 F.2d 17 (5th Cir. 1957); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252 (7th Cir. 1960); cert. dismissed 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); Foxboro Co. v. Taylor Instrument Companies, 157 F.2d 226 (2d Cir. 1946), cert. denied 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947).

■ *File wrapper.*—The file wrapper contains the entire record of the proceedings in the Patent Office from the first application papers to the issued patent. Since all express representations of the patent applicant made to induce a patent grant are in the file wrapper, this material provides an accurate charting of the patent's pre-issuance history. One use of the file wrapper is file wrapper estoppel, which is the application of familiar estoppel principles to Patent Office prosecution and patent infringement litigation. The patent applicant must

---

9. E.g., Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658 (1892); Marconi Wireless Telegraph Co. of America v. United States, supra; Bates v. Coe, 98 U.S. 31, 25 L.Ed. 68 (1878); Cimiotti Unhairing Co. v. American Fur Refining Co., supra; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S. Ct. 235, 312 U.S. 654 (1940); United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Fauber v. United States, 37 F.Supp. 415, 93 Ct.Cl. 11 (1941); Stearns v. Tinker & Rasor,

252 F.2d 589 (9th Cir. 1957); Carl Braun, Inc. v. Kendall-Lamar Corp., 116 F.2d 663 (2d Cir. 1941); Hutzler Bros. Co. v. Sales Affiliates, Inc., supra; Scherbatskoy v. U. S. Steel Corp., 287 F.2d 552 (7th Cir. 1961); National Transformer Corp. v. France Mfg. Co., 215 F.2d 343 (6th Cir. 1954); Standard Duplicating Machines Co. v. American Business Machines Corp., 174 F.2d 101 (1st Cir. 1949), cert. denied 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503.

convince. the patent examiner that his invention meets the statutory requirements;[10] otherwise, a patent will not be issued. When the application is rejected, the applicant will insert limitations and restrictions for the purpose of inducing the Patent Office to grant his patent. When the patent is issued, the patentee cannot disclaim these alterations and seek an interpretation that would ignore them. He cannot construe the claims narrowly before the Patent Office and later broadly before the courts.[11] File wrapper estoppel serves two functions in claim interpretation; the applicant's statements not only define terms, but also set the barriers within which the claim's meaning must be kept. These results arise when the file wrapper discloses either what the claim covers or what it does not cover.

▮▮▮▮▮ The file wrapper also has a broader and more general. use. This is its utilization, like the specification and drawings, to determine the scope of claims.[12] For example, the prior art cited in the file wrapper is used in this manner. In file wrapper estoppel, it is not the prior art that provides the guidelines, but the applicant's acquiescence with regard to the prior art. In its broader use as source material, the prior art cited in the file wrapper gives clues as to what the claims do not cover. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316 (1924); Remington Rand, Inc. v. Meilink Steel Safe Co., 140 F.2d 519 (6th Cir. 1944). Moto-Mower Co. v. E. C. Stearns & Co. Inc., 126 F.2d 854 (2d Cir. 1942).

### III

▮▮▮▮ The use of the various parts of the patent to determine the meaning of the claims is only half the process of determining patent infringement. The other half is "reading the claims on the accused structures." If the claims read literally on the accused structures, an initial hurdle in the test for infringement has been cleared. The race is not over; it has only started. To allow literality to satisfy the test for infringement would force the patent law to reward literary skill and not mechanical creativity. And since the law is to benefit the inventor's genius and not the scrivener's talents, claims must not only read literally on the accused structures, but also the structures must "do the same work, in substantially the same way, and accomplish

10. 35 U.S.C. § 103 requires that: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

11. E.g., I.T.S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335 (1926); Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500 (1894); Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Powers-Kennedy Contracting Corp. v. Concrete Mixing and Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278 (1930); Keystone Driller Co. v. Northwest Engineering Corp., 294 U.S. 42, 55 S.Ct. 262, 79 L.Ed. 747 (1935); Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 51 S.Ct. 291, 75

L.Ed. 707 (1931); Also, Pine, "File Wrapper Estoppel" in Encyclopedia of Patent Practice and Patent Management, 295 (Calvert ed.).

12. The use of the file wrapper as "legislative history" has been condoned by most courts. E.g., Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. (12 Otto) 222, 26 L.Ed. 149 (1880); Crawford v. Heysinger, 123 U.S. 589, 8 S.Ct. 399, 31 L. Ed. 269 (1887); Lavelle Aircraft Corp. v. United States, 358 F.2d 1005, 175 Ct. Cl. 325 (1966); Jones v. United States, 100 F.Supp. 628, 120 Ct.Cl. 747 (1951); Moon v. Cabot Shops, 270 F.2d 539 (9th Cir. 1959); cert. denied 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960); Westinghouse Electric Corp. v. Hanovia Chem. & Mfg. Co., 179 F.2d 293 (3d Cir. 1949); Mall Tool Co. v. Quaker Vibrators, Inc., 30 F.Supp. 841 (E.D.Pa.1939). Contra; A. G. Spalding & Bros. v. John Wanamaker, 256 F. 530 (2d Cir. 1919); Zenith Radio Corp. v. Lehman, 121 F. Supp. 69 (S.D.N.Y.1954), aff'd 217 F.2d 954 (2d Cir. 1955).

substantially the same result." Dominion Magnesium Ltd. v. United States, 320 F.2d 388, 396, 162 Ct.Cl. 240, 252 (1963). This approach of making literal overlap only a step and not the entire test of infringement has been consistently applied by the courts since Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, at 568, 18 S.Ct. 707, at 722, 42 L.Ed. 1136 (1898), where Justice Brown stated:

> * * * The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent. * * * [13]

 If the claims do not read literally on the accused structures, infringement is not necessarily ruled out. The doctrine of equivalence casts around a claim a penumbra which also must be avoided if there is to be no infringement. It provides that a structure infringes, without there being literal overlap, if it performs substantially the same function in substantially the same way and for substantially the same purpose as the claims set forth.[14] Equivalence is the obverse of the discounting of literal overlap. The latter is to protect the accused; the former to protect the patentee. The rationale behind equivalence was set forth by the Supreme Court in Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at 607, 70 S.Ct. at 856, 94 L.Ed. 1097:

> [T]o permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and unsubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law. * * *

 Checking the subordination of substance to form and not depriving the inventor of the benefit of his invention cannot be standardized. The range of equivalence varies with each patent; however, some general guidelines can be drawn. One important guide is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was. Id at 609, 70 S.Ct. 854. Another guide is the notion that pioneer patents are to be given wider ranges of equivalence than minor improvement patents. Pratt & Whitney Co. v. United States, supra; Aluminum Co. of America v. Thompson Products, Inc., 122 F.2d 796 (6th Cir. 1941). This statement is less a canon of construction and more a shorthand expression for the dictates of the law and the patents themselves. The doctrine of equivalence is subservient to file wrapper estoppel.

13. E.g., Singer Mfg. Co. v. Cramer, 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437 (1904); Graver Tank & Mfg. Co. v. Linde Air Products Co., supra; Perry v. United States, supra; Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 194 F.2d 945 (7th Cir. 1952); Grubman Engineering & Mfg. Co. v. Goldberger, supra; S. S. Kresge Co. v. Davies, 112 F.2d 708 (8th Cir. 1940); Standard Oil Development Co. v. James B. Berry Sons' Co., 92 F.2d 386 (3d Cir. 1937); Mattel, Inc. v. Louis Marx & Co., 200 F.Supp. 593 (S.D.Calif.1961); U. S. Gypsum Co. v. Rock Wool Insulating Co., 212 F.Supp. 1 (D.Colo.1962).

14. E.g., Machine Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935 (1877); Graver Tank & Mfg. Co. v. Linde Air Products Co., supra; Pratt & Whitney Co., Inc. v. United States, 345 F.2d 838, 170 Ct.Cl. 829 (1965); Dwyer v. United States, 357 F.2d 978, 174 Ct.Cl. 1064 (1966); Badowski v. United States, 140 F.Supp. 544, 135 Ct.Cl. 93 (1956); Chicago Pneumatic Tool Co. v. Hughes Tool Co., 97 F. 2d 945 (10th Cir. 1938) cert. denied 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415; Powder Power Tool Corp. v. Powder Actuated Tool Co., Inc., 230 F.2d 409 (7th Cir. 1956).

It may not include within its range anything that would vitiate limitations expressed before the Patent Office. Exhibit Supply Co. v. Ace Patents Corp., supra; Smith v. Magic City Kennel Club, Inc., supra. Thus a patent that has been severely limited to avoid the prior art will only have a small range between it and the point beyond which it violates file wrapper estoppel. Similarly a patent which is a major departure from the prior art will have a larger range in which equivalence can function. The scope of the patents also influences the range of equivalence. A pioneer patent which occupies symbolically a six-inch circle will have three inches of equivalence if its range is fifty percent. An improvement patent occupying a two-inch circle has only one inch of equivalence with the same range. Thus with relatively identical ranges, the scope of the patent provides the pioneer patent with absolutely a larger range of equivalence.

### IV

In summary, the determination of patent infringement is a two-step process. First, the meaning of the claims in issue must be determined by a study of all relevant patent documents. Secondly, the claims must be read on the accused structures. In doing this, it is of little value that they read literally on the structures. What is crucial is that the structures must do the same work, in substantially the same way, and accomplish substantially the same result to constitute infringement. This is the general approach which this court uses to determine the infringement of all the patent claims properly before it in this case.

### The Patents

The patents in suit are concerned with rotor structures and control systems on rotary wing aircraft. The two principal types of rotary wing aircraft are the helicopter and the gyroplane (also referred to by plaintiff's trademark Autogiro).[15] The autogiro has both fixed wings and rotary blades, and resembles a cross between an airplane and a helicopter. The helicopter has only rotary blades. The autogiro is propeller-powered; the helicopter, rotary blade-powered. The autogiro cannot achieve under normal circumstances a vertical take-off like the helicopter with rotary blade power; it must taxi on takeoffs like the airplane with propeller power. The two types of aircraft do have several common characteristics. They both rise and descend and control horizontal movements through the operation of the same control systems—respectively, the collective and cyclic pitch control system.[16]

### I

*Stanley Patent No. 2,302,-068.*—Neither party has excepted to the trial commissioner's finding of fact on this patent and its single claim; therefore, it is adopted as part of this opinion. The '068 patent [17] is concerned with rotor blade construction. Since they have routed and not apertured rotor blades, the accused structures, the Vertol HUP-1 and the Vertol H-21B helicopters, do not infringe the one claim of this patent.

### II

Court of Claims Rule 58(c) requires that " * * * [a]ppropriate references shall be made at the end of each

---

15. "Autogiro" was coined by the inventor, Juan de la Cierva, as a proprietary name. When spelled with a lower case *a*, it is used as a generic term. Other generic terms include autogyro, rotorplane, and giro. In this opinion, "autogiro" will be used to cover this group of aircraft.

16. A more detailed analysis of the operation of these two types of rotary wing aircraft appears in the discussion of the various patents. For background on heli-

copters and autogiros, see, generally, Gablehouse, Helicopters and Autogiros, Chaps. I–III and at 210–212, 218, 222–224, and 227–230; Cierva, Wings of Tomorrow; Canby, A History of Flight; Francis, The Story of the Helicopter.

17. For this and all other patents mentioned in this opinion, identification will be made by reference to the last three digits of the patent's number.

exception to the parts of the record relied upon in support thereof." Otherwise, in determining the merit of the exceptions, the court would be required to go through the entire record without benefit of a baedeker. Such a task relegates the court to making the parties' case rather than deciding it. Thus it has been strict in enforcing Rule 58(c). For example, a party has not been allowed to set forth only its own extended narrative version of the facts with an appendix of its own proposed findings of fact. Hunt and Willett, Inc. v. United States, 351 F.2d 980, 168 Ct.Cl. 256 (1964). See, also, Societe Anonyme Des Ateliers Brillie Freres v. United States, 160 Ct. Cl. 192 (1963); Schmoll v. United States, 63 F.Supp. 753, 105 Ct.Cl. 415, cert. denied 329 U.S. 724, 67 S.Ct. 69, 91 L.Ed. 627 (1946).

■ For eight of the patents and their claims, defendant has excepted to the trial commissioner's opinion by only listing the numbers of the findings of fact with which it finds fault. No briefs have been submitted in support of these exceptions. No references to the trial record or exhibits have been made to underpin the allegation that the trial commissioner erred in his findings. This method of excepting is a hollow gesture and has the same effect that failure to except has. See, Harrington v. United States, 161 Ct.Cl. 432 (1963); Batchelor v. United States, 169 Ct.Cl. 180, cert. denied 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed. 2d 109 (1965). This failure to meet the burden of Rule 58(c) results in this court's adoption of the trial commissioner's findings of fact on the following patents:

■ *Larsen Patent No. 1,948,457.—* The '457 patent relates to rotary wing aircraft sustaining rotors and particularly to improved blade damper mechanisms for controlling the pivotal movement of rotor blades about their vertical pivots. Claims 9, 12, 13, 14 and 18 of this patent are infringed by the Vertol HUP–1 helicopter and particularly the construction of its fore and aft rotors.

■ *Cierva Patent No. 1,994,465.—* The '465 patent relates to the mechanism for folding the rotor blades of rotary wing aircraft equipped with vertical pivots and to the mechanism for controlling the movement of the blades about these pivots. Claims 1, 5, 6, 7, 10 and 13 are infringed by the Vertol HUP–1 helicopter and particularly the construction of its fore and aft rotors.

■ *Larsen Patent No. 1,990,291.—* The '291 patent relates to a method for adjusting the effective incidence of flappingly-pivoted rotor blades in their tracking. Claim 4 is infringed by the Hiller H–23A helicopter and particularly its sustaining rotor construction, the Vertol HUP–1 helicopter and particularly the construction of its fore and aft rotors, and the Bell HTL–4 helicopter and particularly its sustaining rotor construction. Claim 5 is infringed by the rotor blade tracking procedures of the Vertol HUP–1. Claim 6 is infringed by the rotor blade tracking procedures of the Hiller H–23A, the Vertol HUP–1, and the Bell HTL–4.

■ *Larsen Patent No. 2,151,215.—* The '215 patent relates to displaceable droop support mechanism for sustaining rotary wing aircraft rotors. Its purpose is to prevent rotor blades from striking the ground or the aircraft when the rotor is either not rotating or rotating at substantially less than normal flight speed. Claims 1, 2, 3, 5, 6, 8 and 9 are infringed by the Kaman HOK–1 helicopter.

■ *Campbell Patent No. 2,339,836.* —The '836 patent relates to aircraft with twin rotors arranged side-by-side so that when viewed from above, the left hand rotor rotates counterclockwise, and the right hand rotor rotates clockwise. Claim 1 is infringed by the Kaman HOK–1 helicopter.

■ *Campbell Patent No. 2,321,572.* —The '572 patent relates to aircraft with side-by-side rotors and flappingly-pivoted blades. Claims 8, 9, 28 and 29 are infringed by the Kaman HOK–1 helicopter.

■ *Campbell Patent No. 2,344,966.* —The '966 patent relates to the control

of aircraft with side-by-side rotors and flappingly-pivoted blades. In particular, this is the turn control which functions by having the rotors so positioned to provide for differential shifting of the rotors' lift lines both fore and aft of the aircraft's center of gravity. This allows the craft to turn or bank in a certain direction. Claim 1 is infringed by the Kaman HOK-1 helicopter.

 *Bennett Patent No. 2,344,967.*— The '967 patent relates to the control of aircraft with side-by-side rotors and flappingly-pivoted blades. In particular, this is the longitudinal and lateral attitude control which functions by the conjoint tilting of the lift lines of the rotors both fore and aft and laterally of the craft. The '967 patent also relates to the rotor phasing which minimizes the bouncing effects which rotors experience in translational flight. Claims 1, 2, 3, 4, 13 and 18 are infringed by the Kaman HOK-1 helicopter.

### III

Findings of fact for the following patents were properly excepted to either in whole or in part:

 *Cierva Patent No. 1,947,901.*— The trial commissioner found Claim 3 infringed by the Vertol HUP-1 helicopter and particularly the rotor construction of its fore and aft rotors, the Hiller H-23A helicopter and its sustaining rotor construction, and the Bell HTL-4 helicopter and its sustaining rotor construction.

*The claim.*—Claim 3 is a combination claim containing several elements, each considered to be essential and equal to all others. Aro Mfg. Co. v. Convertible Top Replacement Co., supra, 365 U.S. at 345, 81 S.Ct. 599, 5 L.Ed.2d 592. For there to be infringement, it is necessary that every element or its substantial equivalent be found in the accused structures. E. g., McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965), cert. denied 383 U.S. 933, 86

S.Ct. 1061, 15 L.Ed.2d 851 (1966); Texas Co. v. Anderson-Prichard Refining Corp., 122 F.2d 829 (10th Cir. 1941); Alex Lee Wallau, Inc. v. J. W. Landenberger & Co., 121 F.Supp. 555 (S.D.N.Y.1954); Vollink v. Holland Celery Planter Co., 33 F.Supp. 203 (W.D.Mich.1938), aff'd 112 F.2d 576 (6th Cir. 1940). Therefore, only one element of the claim is to be discussed. This is the element which states:

> In an aircraft, a sustaining rotor construction having blades mounted for movement with respect to an axis member and *so proportioned* that, under the influence of air currents, the blades have an average autorotational speed at the tip substantially in excess of the maximum flight speed of which the craft is capable. * * *[18] [Emphasis added.]

The claim, on its surface, defines "so proportioned" in terms of function or result; however, a reading of the term in light of the patent documents shows "so proportioned" to include a means of accomplishing its function. See 35 U.S.C. § 112. The specification shows that the proportioning is a relationship between rotor blades and a fixed wing. In the beginning, it states that:

> * * * the present invention contemplates certain novel features of proportioning and disposition of the blades and blade system, and the relation thereof to the fixed lifting surfaces * * *. '901 Specification 1, ls. 46-50.

The invention is later described in the following manner:

> According to the most complete development of the invention, however, I contemplate combining, in the same construction, fixed wings of a certain positive incidence in conjunction with a rotor having freely swinging air-rotated blades, each of which blades is itself set at positive incidence with relation to a no-lift setting on the axis * * *. Id at 2, ls. 3-9.

18. The complete text of this claim and all other claims properly excepted to is in Appendix I.

In a section which discusses embodiments of the '901 patent, the specification expressly discusses proportioning. The embodiments referred to in this section are not means of proportioning the rotor blades, but various relationships between the rotor blades and a fixed wing. The rotor blade-fixed wing relationship is constant throughout this section. No other relationship is suggested, only various ratios of this relationship.[19]

Plaintiff contends that "so proportioned" refers to the construction of the individual blades. It cites specification references to "a thin or medium-thick section of substantially fixed center of pressure" (id at 3, ls. 46–48) and a blade "of uniform symmetry from end to end of its effective lifting portion" (id at 3, ls. 28–30). Neither of these references was made in the company of the term proportioning. Furthermore, these references are to embodiments inasmuch as the specification states that "[t]he foregoing are cited to show that different types of blade construction may be employed in carrying out the present invention." Id at 3, ls. 51–53.

The file wrapper does not compel a different interpretation of the claim. Claim 3 was initially rejected three times on the strength of the prior art. Referring to its rejection, along with other claims, the applicant remarked about "the entirely novel cooperative relation-ships of the rotor and the particular type and arrangement of fixed wing employed * * *." '901 File Wrapper 124. The novelty of this relationship between rotor blades and fixed wings is recited in other parts of the file wrapper dealing with the inadequacy of the prior art to meet the spirit of his claims. See, e. g., id at 46, 60 and 82.

■■■ The above interpretation of "so proportioned" does not ignore the concept of claim differentiation which states that claims should be presumed to cover different inventions. This means that an interpretation of a claim should be avoided if it would make the claim read like another one.[20] Claim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated.

Claims 4–7 of the '901 patent refer to a substantially fixed aerofoil (i. e. wing). And Claims 8–17 refer to a relatively fixed lifting aerofoil surface. Interpreting Claim 3 to refer to a fixed wing would not render any of those claims redundant. Claims 4 and 5, the ones with which 3 has the greatest similarity, are markedly different. Claim 3 refers to "maximum flight speed of which the craft is capable;" Claims 4 and 5 refer to the "translational flight of which the craft is capable." Also, Claim 3 does not have the specificity of these claims—for example, their limitation to an aircraft

19. The '901 Specification states at 3, l. 149–4, l. 20:
"Still further, to obtain to the fullest extent the advantages hereinbefore discussed, especially as to the combined effects of the positive-incidence rotor blades and positive-incidence fixed wings, such as: increased lifting efficiency, increased top speed of the craft, and maintenance of the closest possible uniformity of rotor speed, it is preferable to make the total area of the fixed wings equal to about 75% to 100% of the amount of area of the four rotor blades, although in certain craft, for constructional reasons, it is desirable that the fixed wings be proportioned somewhat smaller, say 50% of rotative blade area. With fixed wing area proportioned in that range (especially between the 75% and 100% limits) and with positive incidence settings of both fixed and rotary wings, the rotor may be made to operate at a substantially uniform speed of rotation through the range of flight speeds of the craft, and such rotational speed, computed at the blade tip, will approximate 140% to 200% of the top speed of the craft."

20. E. g., Kemart Corp. v. Printing Arts Research Laboratories, Inc., 201 F.2d 624 (9th Cir. 1953); Western States Machine Co. v. S. S. Hepworth Co., 147 F.2d 345 (2d Cir. 1945), cert. denied 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945); Cameron Iron Works v. Stekoll, 242 F.2d 17 (5th Cir. 1957); Kennedy v. Trimble Nurseryland Furniture, Inc., 99 F.2d 786 (2d Cir. 1938); .Baker-Cammack Hosiery Mills, Inc. v. Davis Co., 181 F.2d 550 (4th Cir. 1950), cert. denied 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605.

"with a substantially fixed aerofoil of an effective area approximately 50 percent to 100 percent of the area of the rotative blades." These differences are not to be undervalued because of their slightness since claims covering the same invention in varying degrees of breadth or scope usually have only slight differences.

■ *The accused structures.*—The Vertol, Hiller, and Bell helicopters found by the trial commissioner to infringe Claim 3 do not have a fixed wing; therefore, they cannot have their rotors proportioned in the manner called for by the claim as explained by its supporting documents. Since they do not operate in substantially the same way as the claim requires, they do not infringe it.

*Prewitt Patent No. 2,380,581.*—The trial commissioner found: (1) Claim 28 infringed by the Hiller H–23A helicopter, and (2) Claims 29, 36, 37, 38 and 42 infringed by the Hiller H–23A and the Bell HTL–4 helicopter. Infringement by these helicopters included their collective pitch systems having both manually and centrifugally actuated pitch governing mechanisms.

*The claims.*—Each claim contains an element which defines a nonmanual mechanism for regulating the rotational speed of rotary wing aircraft rotors.[21] Such changes are achieved through the use of movable weights mounted in each

rotor and attached to the collective pitch control system. As the rotor speeds up, the concomitant increase in centrifugal force causes the weights to move outboard. Such movement increases the pitch angle of the rotor blades and slows the blades by presenting a greater blade surface to the air flow.

In listing the patent's purposes, the '581 specification states at 1, col. 2, ls. 1–5: "A further object is to provide governing means in cooperation with my blade incidence control which will tend to maintain constant rotational speed of the rotor." Since the term "governing means" is only used in the specification in this way,[22] it is proper to presume that it is being used in the same way in Claims 29 and 37. op. cit. supra at footnote 8. The other claims (28, 36, 38 and 42) use the term "centrifugal means." Since it is centrifugal means which produces the governing means, these terms are interchangeable. See '581 Specification at 2, col. 2, ls. 10–17.

Plaintiff contends that only Claim 28 provides a means for governing rotational speed of the rotor. It claims that centrifugal means and governing means are not the same. To obtain governing means, it says that there must be centrifugal means plus a resilient means and that only Claim 28 provides this combination.[23] This combination is only

---

21. These elements are: (28) "centrifugal means operatively associated with the rotor and responsive to increase of rotational speed to urge the blades toward increased pitch angles, and adjustable resilient means operatively associated with the centrifugal means to vary the speed at which such urge is neutralized"; (29) "governing means for changing said pitch angles, and means modifying the effectiveness of the governing means to change the speed at which the pitch angles are affected"; (36) "centrifugal means operatively associated with the rotor and responsive to increase of rotational speed to urge the blades toward increased pitch angles"; (37) "supplemental governing means in part at least mounted on the rotor for changing the pitch angles of said blades"; (38) "centrifugal means operatively associated with the rotor and responsive to varia-

tions of rotational speed to urge the blades toward changed pitch angles, and means manually actuated to override the centrifugal governor means to provide for positive manual setting of the pitch angles"; and (42) "centrifugal means operatively associated with the rotor and responsive to variations of rotational speed to urge the blade toward changed pitch angle."

22. See id. at 1, col. 1, l. 29—col. 2, l. 11.

23. In support of this, it cites id at 2, col. 2, ls. 17–29:
"For my governing device, I have weights located in the blades which are acted upon by centrifugal forces resulting from the rotation of the rotor.
"The weights are attached to the corresponding block incidence adjustment through cables in such manner as to tend to increase the incidence angle of the

a preferred embodiment in that the resilient means (usually a spring) is not necessary for the maintenance of a constant rotational speed; it only acts as an aid to such an end. id at 4, col. 1, ls. 8–30. Without the resilient means, the centrifugal means will still "tend to maintain constant rotational speed of the rotor."

 In prosecuting Claims 28, 29, 36 and 37 of the '581 patent [24] before the Patent Office, the applicant based their validity on novel non-manual governing means which tended to maintain constant rotor speed.[25] After the claims had been so narrowed, the Patent Examiner allowed Claims 28, 29 and 36; Claim 37 was rejected for not distinguishing the prior art. It was then allowed when amended to be in accord with its companion claims. '581 File Wrapper at 73. After the allowance of the '581 patent, Claims 38 and 42 were entered under Patent Office Rule 78 [26] which permits the entry of additional claims after the allowance of the application. This rule is not intended to provide a way for the continued prosecution of an approved application; an additional claim that is not "obviously allowable" is usually not accepted. See Manual of Patent Examining Procedure 714.16. A claim will most likely be "obviously allowable" if it is no broader in scope than claims already allowed. Thus the file wrapper raises the presumption that Claims 38 and 42

are subject to the same limitations on governing means as 28, 29, 36 and 37.

The file wrapper supports the idea that the resilient means is not a necessary ingredient in the governing means by stating:

As additional factors in the control situation the provision of the spring 113 with or without its variable control (wing nut 114) is a variant on the automatic governor to change the rotative speed at which the governor becomes effective, and thus to change the predetermined R.P.M. and pitch angle. This has been pointed out in certain of the new claims which are urged for allowance as not anticipated by any of the art of record, notably and illustratively [claim 28] * * *." '581 File Wrapper at 59.

Furthermore, when claiming the governing means to be an advance over the prior art, the applicant made no distinction between Claims 28, 29, 36 and 37; even though only 28 contained a resilient means, all were grouped together in discussing advances over the prior art.

*The accused structures.*—On the Bell HTL–4 helicopter, the accused structures are upright counterweights attached to the inboard trailing edges of the rotor blades.[27] These counterweights balance and counteract aerodynamic forces (rotor loads and collective pitch loads) operating on the blades that otherwise would have to be absorbed by the control sys-

---

blade by the action of the centrifugal tension in the cables. Biased against the action of the centrifugal weight is an adjustable spring or elastic means. By this arrangement, the rotor tends to rotate at a constant speed until disturbed by the pilot."

24. When first entered, the claims were numbered 32, 33, 39 and 40. To avoid confusion, claims will be referred to at all times by their final numbers.

25. At 58 of the '581 File Wrapper, the applicant stated that "the system disclosed in the instant specification and drawings automatically tends to return the blade pitch angles to a predetermined value without the attention of the pilot." And id at 59: " * * * applicant has provided control devices in the form of an

automatic governor so arranged as 'to urge the pitch angles of the blades or the R.P.M. of the rotor, to a substantially normal value used in level flight, which is completely foreign to any of the art of record. Illustratively only, the centrifugal weights disclosed provide a function of governing which is not present in [the prior art]."

26. Rule 78 which is now Rule 312 states: "Amendment after the notice of allowance of an application will not be permitted as a matter of right, but may be made, if the printing of the specification has not begun, on the recommendation of the primary examiner, approved by the Commissioner, without withdrawing the case from issue."

27. See drawing 1 in Appendix.

tems and the pilot. They produce twisting moments approximately balancing those created by centrifugal force which would normally make pitch change possible only with an undesirably large force. The weights do not perform a rotor speed governing function. The HTL–4 has no non-manual rotor speed governor; rotor speed is always controlled by the pilot.

On the Hiller H–23A helicopter, the accused structures are flyweight ballast arms attached to the rotor blades. They serve the same function that the counterweights on the Bell HTL–4 helicopter do. Rotor speed control is also a manual operation on this craft.

█ Since the accused structures on these two helicopters do not achieve the same or a substantially similar result as the claims, they do not infringe the '581 patent.

█ *Cierva Patent No. 2,380,583.*— The trial commissioner found: (1) Claim 56 infringed by the straight and twisted wooden rotor blades of the Vertol. HUP–1 helicopter and the tandem-disposed rotors with wooden or metal blades of the Vertol H–21B helicopter, (2) Claim 59 infringed by the Vertol HUP–1, the Vertol H–21B, the sustaining rotor construction of the Bell HTL–4 helicopter, and the sustaining rotor construction of the Hiller H–23A helicopter, (3) Claim 60 infringed by the Vertol HUP–1 and the Vertol H–21B, (4) Claim 62 infringed by the *rotor construction of the* fore and aft rotors and rotor blades of the McCulloch MC–4C helicopter, (5) Claims 64 and 65 infringed by the Vertol HUP–1, the Vertol H–21B, the McCulloch MC–4C, the Bell HTL–4, and the Hiller H–23A. Only Claims 59, 64 and 65 have been properly excepted to; therefore, we adopt the trial commissioner's findings of infringement on Claims 56, 60 and 62.

*Claim 64.*—An element of this claim states that the rotor blade's *sectional* mass center be at least as far forward as its aerodynamic center. "Sectional" only appears once in the specification. In explaining that movable weights may be built into a rotor blade to permit the shifting of the mass center of the blade both forwardly and outwardly, it states:

> [a]djustment of the weight as well as of the sectional and longitudinal location of the center of gravity of the blade may thus also be obtained. '583 Specification at 8, col. 1, ls. 70–73.

This context gives "sectional" a directional meaning. Its juxtaposition with "longitudinal" indicates that it refers to the front-rear (or chordwise) direction, and the other word refers to the inboard-outboard (or spanwise) direction of the blade. Thus "sectional" is used in the sense of "cross-sectional" and not some constituent section.

█ Not only is there no mention of "sectional" as meaning "part" in the specification, but also there is the problem that such a meaning might lead to invalidation of the claim for indefiniteness. No leads as to what section is involved can be found in any of the patent documents. Yet, if a particular section is intended in the claim, it must be pointed out so that people skilled in the art can make use of the patent. 35 U.S.C. § 112. Failure to meet this requirement can result in the claim's invalidation. See, e. g., Bullard Co. v. General Electric Co., 348 F.2d 985 (4th Cir. 1965); Locklin v. Switzer Bros., Inc., 299 F.2d 160 (9th Cir. 1961), cert. denied 369 U.S. 861, 82 S.Ct. 950, 8 L. Ed.2d 18 (1962); Societe Anonyme Des Anciens Etablissements Cail v. United States, 43 Ct.Cl. 25 (1907), aff'd 224 U.S. 309, 32 S.Ct. 479, 56 L.Ed. 778 (1912).

Use of "sectional" to mean "cross-sectional" does not violate the doctrine of claim differentiation. Claims 56 and 57 use *mass center* in the same way that we have interpreted *sectional mass center* as to Claim 64. Claim differentiation would normally have different expressions in different claims read differently. But in these claims (56, 57 and 64), the two phrases are meant to be interchangeable. Claims 56 and 57 use references to the chord to convey what 64 achieves by using "sectional" and not making any ref-

erences to the chord. Thus, the difference between these phrases is intended to be one of style and not content.

■ *The accused structures.*—Exceptions have only been taken to the trial commissioner's findings of infringement on the Bell HTL–4, the Hiller H–23A, and the McCulloch MC–4C. On the Vertol HUP–1 and H–21B helicopters, we adopt his findings of infringement.

The mass center generates forces that push downwardly on the blade when it is producing lift. The aerodynamic center generates upward forces. The effect of these forces depends upon their relative placement along the blade's cross-section. If the two centers occupy the same spot, their forces balance out. This is called neutral pitching moment. With the aerodynamic center forward, the forces push upward and there is a positive pitching moment. With the mass center forward, the leading edge is forced downward and a negative pitching moment results.[28] A negative pitching moment reduces blade flapping and increases rotor efficiency. This is the result Claim 64 seeks, in part, to achieve. '583 Specification at 3, col. 2, ls. 20–33.

■ None of the three excepted to structures infringe Claim 64. Neither the Bell HTL–4 nor the Hiller H–23A has a cross-sectional negative pitching moment. The Bell helicopter has a mass center one to two percent behind the aerodynamic center. The Hiller helicopter has the mass center one to three percent behind the aerodynamic center. Without the negative pitching moment, these structures cannot achieve the desired result the way the claim sets it forth. The same holds for the McCulloch MC–4C which has a neutral pitching moment.

■ *Claim 65.*—It is dependent upon Claim 64 and can only be infringed if 64 is infringed. Application of Schutte, 244 F.2d 323, 44 CCPA 922 (1957).

*The accused structures.*—We make the same holding on 65 that we made on 64. We adopt the trial commissioner's findings that the Vertol HUP–1 and H–21B helicopters infringe Claim 65. And we find that all other accused structures do not infringe Claim 65.

*Claim 59.*—This claim provides, in part, for the placement of weights along the leading edge of the blade near the tip.[29] This placement helps bring the mass center of the blade forward of the aerodynamic center so as to achieve negative pitching moment. Id at 4, col. 1, ls. 19–22. It also increases the total moment of inertia of the rotor in an economical manner in that a lesser weight out near the tip is as effective in increasing inertia as a greater weight inboard. Id at 4, col. 1, ls. 14–19 and 9, col. 1, ls. 63–73.

*The accused structures.*—Exceptions have only been taken to the trial commissioner's findings of infringement on the Bell HTL–4 and the Hiller H–23A. On the Vertol HUP–1 and H–21B helicopters, we adopt his findings of infringement.

■ The Bell and Hiller helicopters have a steel bar on their rotor blades which is close to the leading edge. It is not however, concentrated near the tip of the blade since it extends the full length of the blade, and is of uniform cross section. The bar aids in achieving negative pitching moment, but not in economically increasing the moment of inertia. Since the bar does not operate in a way substantially similar to the teachings of Claim 59 and with a substantially similar result, the Bell and Hiller helicopters are not infringing structures.

*Cierva Patent No. 2,216,162.*—The trial commissioner found. (1) Claims 7 and 22 infringed by the Bell HTL–2 and HTL–1 helicopters, and (2) Claim 8 infringed by the HTL–2.

*The claims.*—The claims of the '162 patent teach a means of obtaining a

---

28. See drawings 2, 3 and 4 in Appendix.

29. See drawing 5 in Appendix for a depiction of this as found in the patent drawings.

measure of vertical rise capacity. They propose the conjoint operation of the rotor drive controls and the blade pitch controls to bring about a simultaneous increase in rotor pitch and a disconnection of rotor power. Power is applied to the rotor only when the craft is on the ground and has its rotor blades at a no-lift pitch. When the rotor is rotating at a sufficient speed, the pilot activates a mechanism that simultaneously increases the collective pitch of the rotor blades and disconnects the power from the rotor. This sudden increase in lift will cause a rotary wing aircraft to literally jump off the ground and thus achieve a semblance of vertical take-off. '162 Specification at 1, col. 1, ls. 6–18.[30]

The conjoint operation of rotor drive and pitch change controls to effect a vertical take-off is not an embodiment of the invention, but is a statement of its desired result. The vertical take-off result is referred to as "the invention." Id at 1, col. 1, l. 6. And id at 3, col. 2 ls. 72–74, it is referred to as "the purpose" of the invention. The specification does discuss embodiments, but as means of implementing the vertical take-off and not additional uses for the conjoint operation of the controls. The following supports this statement:

> The invention is susceptible of a number of constructional embodiments. For example, a control lever regulating the pitch angle and a control lever actuating the clutch release may be arranged side by side, similarly to the throttle control levers of twin-engined aircraft in such a way that either lever can be operated independently but both levers can be operated by one hand of the pilot for the purpose of simultaneously releasing the starter clutch and increasing the pitch angle. To

obtain this result the two levers must register with one another when the clutch releasing lever is in the "clutch engaged position" and the pitch control lever is in the minimum pitch position. Id at 1, col. 2, ls. 16–30. See, also id at 2, col. 2, ls. 67–75 and at 3, col. 2, l. 72–4, col. 1, l. 5.

References to the fact that the conjoint operation should allow for separate control of the rotor and pitch mechanisms [31] does not show that functions other than vertical take-offs are contemplated by the invention. They only show that the linkage between the two controls should be constructed to allow each control to also serve its normal function.

■ *The accused structures.*—Since its rotor is autoratively operated, an autogiro cannot use the rotor to achieve vertical takes-offs unless it is equipped with some additional mechanism such as that taught by the '162 patent. The accused structures, being helicopters, do not require vertical take-off assistance. With a powered rotor, they have the ability to rise vertically as a matter of normal operating procedure. Since the patentee has limited his patent's result to only vertical take-off assistance, the accused structures do not achieve the same or a substantially similar result. They also do not operate in the same way that the claims teach since at no time would the pitch of a helicopter's rotors be increased simultaneoulsy with disconnection of the rotor power. Claims 7, 8 and 22 are not infringed.

■ *Cierva Patent No. 2,421,364.*— The trial commissioner found: (1) Claims 33, 44, and 45 infringed by the Kaman HOK–1 helicopter, and particularly the construction of its rotors, (2) Claims 53 and 54 infringed by the Bell

---

30. The specification states:
"The invention refers to the method of 'taking-off' which consists in over-speeding the rotor by means of the starter transmission, the latter having a suitable gear ratio for this purpose, with the rotor blades set at a small pitch angle, preferably zero, and increasing the blade pitch angle to a value at least as great

as that utilized in autorotative flight substantially at the same time as the starter transmission is disengaged, in order to utilize the excess kinetic energy of the overspeeded rotor to raise the aircraft substantially vertically from the ground."

31. Id. at 1, col. 1, ls. 19–27 and col. 2, ls. 45–46.

HTL–4 helicopter, and particularly its sustaining rotor construction, the Hiller H–23A helicopter and its rotor construction, and the McCulloch MC–4C helicopter and its fore and aft rotors, (3) Claims 55, 56 and 60 infringed by the Bell HTL–4 and the Hiller H–23A. Claims 33, 44 and 45 have not been properly excepted to; therefore, we adopt the trial commissioner's findings of infringement on these claims.

*The claims.*—Where the '162 patent provided manual means to accomplish a vertical take-off, the '364 patent provides nonmanual means.

■■■ Claims 54, 55 and 60 were first presented to the Patent Office on February 26, 1947; Claim 53, on May 6, 1947. This was some eleven years after the filing of the patent application. '364 File Wrapper 224, 235–238. It was four years after the first successful helicopter flight using the accused structures and more than one year after the completion of the first production helicopter using the accused structures. Claims which have been first filed more than one year after public usage may be invalid. 35 U.S.C. § 102(b).[32] Where the late-filed claim only makes express what would have been regarded as the equivalent of earlier claims or where it merely incorporates into one claim what was to be gathered from the perusal of all, if read together, it is to be allowed. These exceptions are permitted since the rule is designed to protect the public against abuses of the patent law and not to deprive inventors of what they plainly never meant to put into the public domain. Engineering Development Laboratories v. Radio Corp. of America, 153 F.2d 523 (2d Cir. 1946); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., supra.

The applicant's late-filed claims were allowed since he limited them to the scope of previously allowed claims. Claim 54 was stated to be "a combination of features within the general purview of claims heretofore allowed * * *." '364 File Wrapper at 249. Claim 55 was called "a combination similar to subject-matter heretofore allowed to applicant." Ibid. Similar comments were made about Claims 56 and 60. Id at 250 and 251. The claims already allowed had limitations regarding vertical take-offs and the nonmanual means of achieving them. They cited specific components needed for the take-off and/or the take-off itself.

■■ Claim 53 was originally entered on the basis of its similarity to Claims 54 and 60. Id at 300–302. By depending upon 54 and 60 to sanction its late filing, 53 must bear their limitations and be considered no broader in scope than previously allowed claims.

The specification states that "[a]n object of this invention is to provide an improved and more efficient rotor particularly adapted for obtaining the most efficient direct take-off possible." '364 Specification at col. 2, l. 54—col. 3, l. 1. It also refers to the object of the invention as obviating the disadvantages of prior vertical take-off devices. Id at col. 3, ls. 7–32.[33]

32. E.g., Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942) and Railway Co. v. Sayles, 97 U.S. 554, at 563 and 564, 24 L.Ed. 1053 (1878) which says at 563 and 564: " * * * Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use." Also, Coats Loaders & Stackers, Inc. v. Henderson, 233 F.2d 915 (6th Cir. 1956); R.U.V. Engineering Corp. v. Borden Co., 170 F.2d 688 (2d Cir. 1948); Jacquard Knitting Machine Co. v. Ordnance Gauge Co., 95 F.Supp. 902 (E.D. Pa.1951), aff'd 213 F.2d 503 (3d Cir. 1954).

33. The specification states:
"In the process of accomplishing a direct take-off, from the instant at which the pitch increase begins until autorotation is established, the rotor operates under a continuously changing regime, char-

The way the '364 patent reaches its desired result is quite simple. When power is connected to the rotor hub, the blades will lag behind the hub because of the resistance of the air to the movement of the blades.[34] When the power is stopped, the blades' inertia force will swing them in advance of the hub.[35] These lead-lag tendencies can be translated into actual blade movement if the blade is mounted on an axis that permits it to move back and forth without restriction. And if the free axis is inclined where the blade swings back and forth, the blade will also change pitch in its movements. When it lags, the pitch angle will decrease. When it leads or swings forward, the pitch angle will increase.[36] The sudden change in pitch angle that will arise when the power is removed from the rotor provides the impetus for a non-manual vertical take-off in a way similar to that provided manually by the '162 patent.[37]

The necessary free axis that allows the blade to swing back and forth without restriction as well as the inclination of the axis are set forth in both the specification and the drawings. The specification provides at col. 10, ls. 50–70:

> The axis of the drag pivot pin (termed alpha axis) is shown in Fig. 13 at [x–x] and it will be seen that this axis is inclined upwardly and outwardly at an acute angle to the longitudinal blade axis b–b.

The result of this arrangement is that movement of the blade on the drag pivot is associated with a change in blade pitch angle such that when the blade lags behind its normal mean radial position, the pitch angle is decreased and vice versa. By this means an automatic control of pitch angle during the starting of the rotor and the take-off is obtained, the effect of the application of the starting torque to the rotor causing the blade to lag and therefore decrease its pitch angle, whereas when the starting torque vanishes on the disengagement of the starter clutch, the blade swings about its drag pivot approximately into its normal radial position with a consequent increase of pitch angle to about the value obtaining in autorotational flight.

In summary, the teaching of the '364 patent and its claims is the means of achieving vertical take-offs. This result is reached by the non-manual jump in pitch angle which in turn is the product of an inclined, free axis taking advantage of a rotor blade's lead-lag tendencies.

*The accused structures.*—The Bell HTL–4 and the Hiller H–23A do not have a free axis on which their blades can swing back and forth; their blades are unyieldingly affixed to the rotor hub with no lead-lag flexibility. Also, they have no inclination which would permit

---

acterized by varying inflow, which, starting at zero, has at first a rapidly increasing positive (downward) value, reaching a peak and thereafter declining more slowly to zero again and finally reversing its sign as autorotation establishes itself.

"If, for take-off, the blade pitch angle is increased almost instantaneously from about zero to an autorotative value of say 5 or 6 degrees, the thrust of the rotor immediately jumps from nothing to a large (peak) value much exceeding the weight of the aircraft, on account of the initial absence of inflow, and as the (downward) inflow builds up the thrust falls sharply and continues to fall as the rotational speed falls. Thus at the beginning of the take-off there is a violent

upward acceleration which is followed by a relatively rapid falling off of lifting effort, which may give rise to a loss of height from the maximum attained, before autorotative flight is established.

"An object of the present invention is to obviate the above-mentioned disadvantages."

34. See drawing 6 in Appendix II.

35. See drawing 7 in Appendix II.

36. See drawing 8 in Appendix II.

37. After the take-off, the pitch decreases to an autorotational angle due to a certain construction of the rotor blade which is taught by the '364 patent at col. 11, ls. 56–60 and col. 12, ls. 17–28 of the specification.

the blades, if they did swing, to change pitch. The McCulloch MC–4C's blades have limited lead-lag flexibility, but there is no inclination that would produce pitch change. All three helicopters achieve vertical take-offs by the power directed to their rotors and have no use for a non-manual take-off as taught in the '364 patent. The accused structures do not do the same work, in the same way, and for the same result as the claims in issue. Nor is their operation substantially similar; therefore, they do not infringe Claims 53, 54, 55, 56 and 60.

*Cierva Patent No. 2,380,580.*—The trial commissioner found: (1) Claims 1, 3 and 4 infringed by the Bell HTL–4 helicopter and its rotor control system, the Hiller H–23A helicopter and its rotor and rotor control system, and the Kaman HOK–1 helicopter and its rotor and rotor control system, (2) Claim 8 infringed by the Vertol HUP–1 helicopter, the McCulloch MC–4C helicopter, and the Vertol H–21B helicopter, (3) Claims 10, 11, 12, 14 and 15 infringed by the Bell HTL–4 and the Hiller H–23A, (4) Claim 13 infringed by the Bell HTL–4, and (5) Claim 36 infringed by the Vertol HUP–1 and the Vertol H–21B.

*The claims.*—Rotary wing aircraft are steered in a horizontal plane by a cyclic pitch control system. This system imposes pitch changes on the rotor blades which cause the rotor to revolve in an inclined plane and which concomitantly produce horizontal movement. Its control device must be a non-rotating mechanism even though the rotor upon which it acts is a rotating mechanism. Generally, there are two types of cyclic pitch control systems. There may be a tilting of the real axis of the rotor or the virtual axis. In tilting the real axis, control is linked directly to a non-rotating part of the rotor hub. The application of control to this part will also tilt the rotating part.[38] In tilting the virtual axis, control is applied directly to the blades. This is usually done by a swashplate which is two concentric rings encircling

the rotor mast and separated by bearings. Only one ring revolves. The pilot's control is linked to the non-rotating ring and the rotating ring is linked by rods to the blades. When control is applied, the entire swashplate tilts and the rods attached to the blades bring about cyclic pitch changes.[39]

The '580 patent and its claims teach cyclic pitch control by tilting the real axis. In the specification the invention is so limited:

Broadly, this stabilizing and controlling action is effected by controlling the effect of the lift line of the rotor, as by causing a shifting of the lift line thereof. Specifically, the invention contemplates mounting the common rotational axis of the rotor for tilting and/or bodily displacement longitudinally and laterally of the craft.

Still more specifically, the invention contemplates mounting the hub or rotational axis of the rotor on a pair of transverse pivots, one of which extends generally longitudinally of the craft and the other of which extends generally transversely of the craft. The preferred arrangement further involves the dual articulation of each wing of the rotor to its hub or axis by means of individual horizontal and vertical pivots.

'580 Specification at 2, col. 2, ls. 20–35. See, also id at 4, col. 1, l. 7—col. 2, l. 14.

In discussing "certain of the more specific objects and advantages of the invention," the specification only discusses the invention in terms of tilting the real axis. id at 6, col. 2, l. 50—7, col. 1, l. 2. The possibility of controlling cyclic pitch by affecting the virtual axis is mentioned. id at 2, col. 2, ls. 13–15 and 5, col. 2, ls. 56–66. The specification goes no further than acknowledging the existence of the other approach; nowhere does it teach such tilting of the virtual axis. Such a casual reference seems sufficient in that the patentee covered this ap-

---

**38.** See drawing 10 in Appendix II.

**39.** See drawing 11 in Appendix II.

proach in his '582 patent which is discussed hereafter.

The embodiments discussed in the specification (id at 7, col. 2, l. 50–12, col. 1, l. 5–) are not embodiments of cyclic pitch control in general, but of cyclic pitch control by tilting the real axis. This lends support to the view that the patentee has limited his invention to the one form of cyclic pitch control. The fact that he might have claimed more is irrelevant. Courts go through the patent documents to find what has been claimed, not what might have been claimed. Keystone Bridge Co. v. Phoenix Iron Co., supra, 95 U.S. at 278, 24 L.Ed. 344.

*The accused structures.*—The Kaman HOK–1, the McCulloch MC–4C, the Vertol HUP–1, and the Vertol H–21B helicopters do not achieve cyclic pitch control by tilting the real axis; instead, their control is the result of bodily moving their blades relative to the hub. The Bell HTL–4 and the Hiller H–23A helicopters impose control through various linkages (i. e., a swashplate) on the rotor blades. A member of the real axis of these two crafts may tilt when control is achieved. This tilting is not by itself cyclic pitch control; instead, it is a coincidental accompaniment to the imposition of cyclic pitch control. That this tilting is the result and not the cause of such control is supported by the fact that the '580 patent's approach creates major problems when used on helicopters. When power is applied through the rotor hub, a high degree of friction is created between the hub parts. This friction is so great that it would take a force of Brobdingnagian proportions to apply control by tilting the real axis.

▮ Even though all the accused structures achieve horizontal movement by cyclic pitch control as the '580 claims teach, they do not do it in the same or substantially the same way; therefore, they do not infringe.

▮ *Cierva Patent No. 2,380,582.*— The trial commissioner found: (1) Claims 1, 2, 3, 4, 5, 7, 8, 9, 12, 13, 16, 17, 18, 19, 20 and 21 infringed by the Vertol HUP–1 helicopter, the Vertol H–21B helicopter, and the McCulloch MC–4C helicopter, (2) Claims 6, 7, 8, 9, 12, 13, 16 and 17 infringed by the Bell HSL–1 helicopter, and (3) Claims 16 and 17 infringed by the Bell HTL–4 helicopter. Only the findings of infringement on the Bell HTL–4 have been properly excepted to; therefore, we adopt the trial commissioner's findings of infringement on all other accused structures.

*The claims.*—This patent teaches cyclic pitch control by tilting the virtual axis. Claim 16 calls for:

> * * * a pitch change pivot operatively interposed between the flapping pivot and the blade mounting member whereby the pitch of the blade may be altered as a unit without shifting the position of the flapping pivot.

In the file wrapper, the applicant limited this claim to cyclic pitch control in defending the patent as an improvement over the prior art. '582 File Wrapper at 149. See, also at 148. At 148–149, he stated:

> * * * This claim involves generally the cyclic pitch control system of the present case and includes specifically the flapping pivot, the pitch change pivot operatively interposed between the flapping pivot and the blade root end mounting member * * *. As pointed out in interview, applicant's attorneys are unaware of any available art showing any such specific arrangement of blade root mounting and cyclic pitch control.

Claim differentiation adds support to the idea that the pitch control in Claim 16 is only the cyclic variety. Claim 17 was offered under Patent Office Rule 78. op. cit. supra, footnote 26 and p. 19. In seeking its acceptance by the Patent Examiner, the applicant stated:

> Claim [17] is based on allowed claim [16], but includes the added feature of control means adapted to alter the mean blade pitch and being operatable independently of the cyclic pitch control. This should be allowable (as dependent from allowed Claim [16]) for

for reasons similar to the basis for allowance of certain other claims * *. '582 File Wrapper at 163. If Claim 16 referred to collective pitch control as well as cyclic pitch control, there would have been no need for Claim 17 which adds collective pitch control to a base of Claim 16. But since claim differentiation would have 16 and 17 cover different materials, it follows that 16 only includes cyclic pitch control.

**■ *The accused structures.*—The** cyclic pitch system of Claim 16 is interposed between the flapping pivot and the blade mounting.[40] The Bell HTL–4's cyclic pitch control pivot is located at a point higher in the rotor hub assembly than either the blade mounting member or the longitudinal axis of the blade.[41] Claim 16 can be read on a combination of the helicopter cyclic and collective pitch control systems since the latter control is interposed between the flapping pivot and the blade mounting member. A combination of these two systems seems to infringe since they achieve horizontal movement by a cyclic pitch system operating in a way taught by the claim. These systems, however, do not interact or contribute together to produce the result taught by the claim. The fact that they can be operated simultaneously has no bearing on whether they have the operative relationship needed to label them an infringing combination. There must be an essential correlation or coordination of the systems which mutually contributes to a common result. The systems need not mechanically interact with one another. They need only act together for the same result; that is to say, they must be part of the same unit which serves a single purpose. E. g., Beecher Mfg. Co. v. Atwater Mfg. Co., 114 U.S. 523, 5 S.Ct. 1007, 29 L.Ed. 232 (1885); Sachs v. Hartford Electric Supply Co., 47 F.2d 743 (2d Cir. 1931); Application of Worrest, 201 F.2d 930, 40 CCPA 804 (1953); Vollink v. Holland Celery Planter Co., supra. The cyclic and collective pitch control systems are not such a com-

bination; they are each a unit, each serving a single purpose. Therefore, the cyclic pitch control system of the Bell HTL–4 does not operate in the same or substantially the same way as Claim 16, and does not infringe it.

Since Claim 17 is dependent upon 16, it can only be infringed by a structure that also infringes 16. Application of Schutte, supra. Therefore, it is not infringed by the Bell HTL–4.

### IV

In summary, we make the following findings of infringement:

(1) *Larsen Patent No. 1,948,457*
 Claims 9, 12, 13, 14 and 18 infringed by the Vertol HUP–1 helicopter.

(2) *Cierva Patent No. 1,994,465*
 Claims 1, 5, 6 7, 10 and 13 infringed by the Vertol HUP–1.

(3) *Larsen Patent No. 1,990,291*
 Claims 4 and 6 infringed by the Hiller H–23A, the Bell HTL–4, and the Vertol HUP–1 helicopters; Claim 5, by the Vertol HUP–1.

(4) *Larsen Patent No. 2,151,215*
 Claims 1, 2, 3, 5, 6, 8 and 9 infringed by the Kaman HOK–1 helicopter.

(5) *Campbell Patent No. 2,339,836*
 Claim 1 infringed by the Kaman HOK–1.

(6) *Campbell Patent No. 2,321,572*
 Claims 8, 9, 28 and 29 infringed by the Kaman HOK–1.

(7) *Campbell Patent No. 2,344,966*
 Claim 1 infringed by the Kaman HOK–1.

(8) *Bennett Patent No. 2,344,967*
 Claims 1, 2, 3, 4, 13 and 18 infringed by the Kaman HOK–1.

(9) *Cierva Patent No. 2,380,583*
 Claims 56, 59, 60, 64 and 65 infringed by the Vertol HUP–1 and the Vertol H–21B; Claim 62, by the McCulloch MC–4C.

(10) *Cierva Patent No. 2,421,364*
 Claims 33, 44 and 45 infringed by the Kaman HOK–1.

---

40. See drawing 12 in Appendix II.

41. See drawing 13 in Appendix II.

(11) *Cierva Patent No. 2,380,582*

 Claims 6, 7, 8, 9, 12, 13, 16 and 17 infringed by the Bell HSL–1 helicopter; Claims 1, 2, 3, 4, 5, 7, 8, 9, 12, 13, 16, 17, 18, 19, 20 and 21 by the McCulloch MC–4C, the Vertol HUP–1, and the Vertol HUP–1, and the Vertol H–21B.

*Patent Validity*

 ■■■ All claims found infringed by the trial commissioner were also found valid. Neither party has properly excepted to any findings of fact on validity. Only on claims found infringed is it necessary to reach a decision on validity. This results from the fact that infringement of an invalid patent it the same as noninfringement.[42] Therefore, we adopt the trial commissioner's findings of validity on all claims found infringed.

 ■■■ On all claims found not infringed, we do not reach the question of validity. We take this approach notwithstanding the argument that the validity issue should be reached whether or not there has been a finding of infringement. See concurring opinion of Judge Frank in Aero Spark Plug Co. v. B. G. Corp., 130 F.2d 290, 292 (2d Cir. 1942). The argument for deciding validity is based on the ground that there is more at stake than only the issue of validity between the two parties. There is a public interest that must be served—an interest that should know the state of a patent so that onerous and unnecessary license and royalty arrangements could be avoided. Unlike this case, the issue of validity was squarely raised on appeal in the *Aero Spark Plug Co.* case. Ibid. This distinction is important; otherwise, this court would be required to do the same work we felt outside our scope on the unexcepted-to infringement issues. The Supreme Court has recognized this practice of not treating the issue of validity when it is not properly raised. Exhibit Supply Co. v. Ace Patents Corp., supra. Fur-

thermore, we find that deciding validity does not substantially serve the public interest. A finding of invalidity might have some psychological value in that a patentee with a court's holding against validity might not be able to exert the pressure against an alleged infringer that a patentee with an unblemished court record might. There is scant legal value to be derived from a holding of invalidity. Only the defendant may collaterally use the holding in a subsequent action against plaintiff. No third party not in a privy relationship with the parties may avoid litigation by the use of collateral estoppel. See Technograph Printed Circuits, Ltd. v. United States, 372 F.2d 969, 178 Ct.Cl. 543 (1967). Although the patentee might be, in Judge Frank's terms, "wiped out" in this suit, he is not, at least in this court, "wiped out" for good.

 In summary, we find valid all claims found infringed. Op. cit. supra, section IV.

*Conclusion*

 Since plaintiff is the lawful owner of all claims found valid and infringed, it is entitled to recover "reasonable and entire compensation" for the unauthorized use of these claims. Judgment is entered to that effect. The extent of liability will be determined in further proceedings before the trial commissioner, pursuant to Rule 47(c).

*Appendix I*

CIERVA PATENT NO 1,947,901

 3. In an aircraft, a sustaining rotor construction having blades mounted for movement with respect to an axis member and so proportioned that, under the influence of air currents, the blades have an average autorotational speed at the tip substantially in excess of the maximum flight speed of which the craft is capable, the blades of the rotor being of an aero·foil section of substantially fixed center

---

**42.** E.g., Miehle Printing Press & Mfg. Co. v. Publications Corp., 166 F.2d 615 (7th Cir. 1948); M. Swift & Sons v. W. H. Coe Mfg. Co., 102 F.2d 391 (1st Cir. 1939); Cummings v. Moore, 202 F.2d 145 (10th Cir. 1953); Breeden v. Attwood Brass Works, 105 F.Supp. 876 (W.D. Mich.1952).

of pressure, and arranged, with respect to the axis member, in such manner as to be free to assume positions of equilibrium between inertia and lift forces at various points in their general path of rotative travel and said blades being set at a positive incidence calculated with respect to the no-lift position relative to a plane perpendicular to the axis of rotation.

### PREWITT PATENT NO. 2,380,581

28. Aircraft comprising a hub, blades mounted on the hub and arranged for variable pitch angles and comprising with the hub a rotor, means manually actuated to govern the pitch angles of the blades, centrifugal means operatively associated with the rotor and responsive to increase of rotational speed to urge the blades toward increased pitch angles, and adjustable resilient means operatively associated with the centrifugal means to vary the speed at which such urge is neutralized.

29. Aircraft comprising a rotatable wing system, the blades of which have variable pitch angles, said system being adapted to accommodate differential flight forces, means for manually changing said pitch angles, governing means for changing said pitch angles, and means modifying the effectiveness of the governing means to change the speed at which the pitch angles are affected.

36. Aircraft comprising a hub, blades mounted on the hub and arranged for variable pitch angles and comprising with the hub a rotor, means manually actuated to govern the pitch angles of the blades, and centrifugal means operatively associated with the rotor and responsive to increase of rotational speed to urge the blades toward increased pitch angles.

37. In aircraft, a rotatable wing system comprising a rotor having blades which have variable pitch angles, means for manually changing said pitch angles, and supplemental governing means in part at least mounted on the rotor for changing the pitch angles of said blades.

38. Aircraft comprising a hub, blades mounted on the hub and arranged for variable pitch angles and comprising with the hub a rotor, centrifugal means operatively associated with the rotor and responsive to variations of rotational speed to urge the blades toward changed pitch angles, and means manually actuated to override the centrifugal governor means to provide for positive manual setting of the pitch angle.

42. A rotative winged aircraft having a sustained rotor comprising a rotatable hub and a blade pivotally connected therewith for upward and downward swinging movement to compensate for differential lift effects in translational flight, the blade mounting on the hub further incorporating means providing for variation of blade pitch angle, means manually actuated to govern the pitch angle of the blades, and centrifugal means operatively associated with the rotor and responsive to variations of rotational speed to urge the blade toward changed pitch angle.

### CIERVA PATENT NO. 2,380,583

59. For an autorotatable sustaining rotor for aircraft, a rotary wing or blade having a flapping pivot mounting and incorporating mass elements additional to structural requirements, said mass elements being concentrated along the leading edge of the blade near the tip thereof.

64. In an aircraft, an autorotatable sustaining rotor adapted to accommodate differential flight forces and comprising a plurality of aeroform blades with means for varying the effective pitch of the blades, each of said blades being of substantially fixed center of pressure section and having its sectional mass center at least as far forward as its aerodynamic center.

65. A variable-pitch flapping rotor blade having the blade features set forth in Claim 64.

### CIERVA PATENT NO. 2,216,162

7. In an aircraft having a sustaining rotor comprising a hub, a plurality of autorotatable blades and pivot mechanism mounting said blades on said hub, independently operatable disconnectible drive

means for the rotor and independently operatable means for raising and lowering the effective pitch of the blades of the rotor, and an interlock between said two independent means mounted for movement between operative and inoperative positions.

8. In an aircraft having a sustaining rotor comprising a hub, a plurality of autorotatable blades and pivot mechanism mounting said blades on said hub, independently operable disconnectible drive, means for the rotor and independently operatable means for raising and lowering the effective pitch of the blades of the rotor, and a movable flight control for the craft adapted in at least one position to interlock said two independent means.

22. The combination, in an aircraft, of a power plant, an autorotatable sustaining rotor including a generally upright hub and blades pivotally secured thereto including mechanism for varying the effective pitch of the blades, mechanism for driving said rotor from said power plant, a separately operatable control for each of said mechanisms, and means for interconnecting said controls at will for common operation.

CIERVA PATENT NO. 2,421,364

53. In an aircraft capable of substantially vertical take-off and descent, a sustaining rotor rotatable about a generally upright axis and adapted to accommodate or compensate for differential flight forces and having means of direct rotor control effective in vertical flight, comprising an elongated aeroform sustaining blade, capable of autorotation at positive pitch, said blade having a root connection adapted to amount the blade at a point on its longitudinal axis, said connection incorporating means for varying the effective pitch of the blade by movement about an axis approximately intersecting the axis of rotation, said blade having a bi-convex profile and a construction providing flexibility in the direction transverse to its rotational path with freedom to yield under varying thrust, the blade further having its mass center substantially on said longitudinal axis.

54. In an aircraft sustaining rotor rotatable about an upright axis and constructed for yielding in the flapping sense sufficiently to accommodate differential lift effects due to translational flight, an elongated aeroform sustaining blade, capable of autorotation, having a root connection adapted to mount the blade at a point on its longitudinal axis, said connection including a pitch varying pivot whose axis approximately intersects the axis of rotation, said blade having a bi-convex profile and being of a construction providing flexibility in the flapping sense and having its sectional mass center located on said longitudinal axis.

55. In an aircraft sustaining rotor adapted to accommodate or compensate for differential flight forces, an elongated aeroform sustaining blade, capable of autorotation, having a blade-swinging pivot whose axis intersects the general axis of rotation to provide for up and down blade-swinging and a pitch-varying pivot disposed in a plane approximately containing the longitudinal axis of the blade and the axis of rotation, and being of a profile and structure providing a mass center location for the blade substantially on said longitudinal axis.

56. In an aircraft sustaining rotor adapted to accommodate or compensate for differential flight forces, an elongated aeroform sustaining blade, capable of autorotation, having a blade-swinging pivot whose axis intersects the general axis of rotation to provide for up and down-blade swinging and a pitch-varying pivot disposed in a plane approximately containing the longitudinal axis of the blade and the axis of rotation, and having a bi-convex profile and being of a structure providing a mass center location for the blade substantially on said longitudinal axis.

60. In an air aircraft, a sustaining rotor adapted to accommodate or compensate for differential flight forces, an elongated aeroform sustaining blade, capable of autorotation, having a blade-swinging pivot whose axis intersects the

general axis of rotation to provide for up and down blade-swinging and a pitch-varying pivot disposed in a plane approximately containing the longitudinal axis of the blade and the axis of rotation, and being of a profile and structure providing a mass center location for the blade substantially on said longitudinal axis, and means for controllably varying the path of rotation of the blade to maneuver the aircraft.

## CIERVA PATENT NO. 2,380,580

1. In an aircraft, a principal means of support in flight comprising a sustaining rotor of the autorotatable-wing type having a substantial vertical rotation axis hereinafter referred to as the rotor axis, means for controllably tilting said rotor axis in relation to the body of the aircraft in at least one generally vertical plane about at least one real or virtual pivot axis, characterized in that any such pivot axis is located above the center of gravity of the aircraft, that the point of intersection of the rotor axis with the projection of the line of resultant aerodynamic reaction of the rotor on a place containing both the rotor axis and the shortest distance between the rotor axis and said pivot axis is above said pivot axis, and that the said pivot axis is offset from the rotor axis in the direction of the aero dynamic reaction line so that in no condition of forward flight does the rotor axis lie between the aerodynamic reaction line and the said pivot axis, the limiting case in which the said pivot axis passes through the said point of intersection being included.

3. An aircraft in accordance with Claim 1, in which the pivot axis is arranged for longitudinal tilting of the rotor and extends generally transversely of the craft.

4. An aircraft in accordance with Claim 1, in which the pivot axis is arranged for lateral tilting of the rotor and extends generally longitudinally of the craft.

8. In an aircraft, a rotative sustaining system including an upright axis structure, blade or wing means adapted to be aerodynamically rotated about said axis structure as a center and mounted for movement with respect to said structure about an axis substantially intersecting the axis of said structure, and control mechanism for the wing means providing for controllable shifting of the lift line of said system, the mounting of each wing including two individual articulations angled to each other and to the longitudinal axis of the wing, whereby to minimize control loads.

10. In an aircraft, a sustaining and controlling rotor blade system comprising a rotatable aeroform blade normally positioned in flight at positive-lift incidence relative to its general rotational path, pivot mechanism for said blade system incorporating a plurality of pivot axes which provide for blade movements for control purposes as well as to compensate for differential flight forces and minimize gyroscopic effects, said mechanism providing an axis of blade oscillation transverse to the general axis of rotation and a rocking axis approximately intersecting said axis of oscillation, both of said axes substantially intersecting the general axis of rotation, and mechanism for controlling said rotor blade system comprising a pilot's control member mounted for movement in a plurality of planes and coupled with pivoted parts of said system by control connections adapted to effect blade movements which tilt the lift line of said system in like sense to the direction of movement of said member by the pilot.

11. In an aircraft, a sustaining and controlling rotor blade system comprising a rotatable aeroform blade normally positioned in flight at positive-lift incidence relative to its general rotational path, power drive means for said system adapted to provide also for autorotational operation of said system, pivot mechanism for said rotor blade system incorporating a plurality of pivot axes which provide for blade movements for control purposes as well as to compensate for differential flight forces and minimize gyroscopic effects, said mechanism providing an axis of blade oscillation transverse to the gen-

eral axis of rotation and a rocking axis approximately intersecting said axis of oscillation, both of said axes substantially intersecting the general axis of rotation, and mechanism for controlling said rotor blade system comprising a pilot's control member mounted for movement in a plurality of plans and coupled with pivoted parts of said system by control connections adapted to effect blade movements which tilt the lift line of said system in like sense to the direction of movement of said member by the pilot, said power drive means being constructed and arranged to permit free blade pivotal movements and operation of the control mechanism under all flight conditions.

12. A construction according to Claim 10 incorporating means by which the system acts to stabilize the craft at a certain flight attitude for a given flight speed.

13. A construction according to Claim 10 incorporating non-rebounding damping means exerting a restraint upon the controllable operations of said system.

14. A construction according to Claim 10, together with resistive means acting to restore said blade to a given general path of rotation relative to the aircraft when their relationship is aerodynamically disturbed.

15. In an aircraft, a sustaining and controlling rotor comprising elongated rotatable blade means, a centrally open rotor hub member, a rotor supporting member projecting upwardly into the central opening of the hub member, pivot mechanisms for respectively mounting the blade means on the hub member and the hub member on the supporting member having pivotal axes intersecting each other and the axis of rotation of the rotor to provide both for rocking movement of the blade means for control purposes and for swinging movement of the blade means to accommodate differential flight forces, and manually regulable means for controlling rocking movement of the blade means, whereby to control the attitude of the aircraft laterally and longitudinally.

36. In an aircraft, a body having toward the rear thereof normally fixed vertical and horizontal tail surfaces for directional and longitudinal stability, a streamlined rotor mounting pylon above the body, an autorotatably actuable sustaining rotor connected to the body by said pylon and having flappingly pivoted wings, means acting upon the rotor for shifting the path of rotation of the wings so as to shift the rotor lift-line both laterally and longitudinally for control purposes, said streamlined pylon housing the control connections to the rotor and being positioned as upright for surfacing for coaction above the center of gravity with the controllable rotor in laterally stabilizing and controlling the craft.

## CIERVA PATENT NO. 2,380,582

16. In an aircraft, a rotor comprising a hub member adapted to rotate about a generally upright axis and a radially extending blade having a root end mounting member, mechanism for pivotally interconnecting the hub and said mounting member to provide for pivotal movements of the blade as a whole with respect to the hub, said pivot mechanism including a flapping pivot providing freedom for upward and downward swinging movement of the blade during normal flight maneuvering, and the pivot mechanism further including a pitch change pivot operatively interposed between the flapping pivot and the blade mounting member whereby the pitch of the blade may be altered as a unit without shifting the position of the flapping pivot, and controllable means for cyclically varying the pitch angle of the blade in synchronism with rotation of the rotor including a pilot's control and connections coupled with the pilot's control and extended therefrom beyond the flapping pivot to the root end blade mounting member, said connections being flexibly-jointed adjacent the flapping pivot axis to accommodate the swinging movements of the blade on the flapping pivot without introducing extensive pitch change movements as a result of said blade swinging movements.

17. A construction according to the preceding claim, with control means

adapted to alter the mean blade pitch, said control means and the controllable means for cyclically varying the pitch being independently operable.

### Appendix II

1.

COUNTERWEIGHT

2.

neutral pitching moment

3.

positive pitching moment

4.

negative pitching moment

5.

*Fig. 10.*

m=weights

6.

Lag

7.

Lead

8.

9. The following are patent drawings.

CIERVA

2,421,364

10.

tilting of the real axis

11.

tilting of the virtual axis

12.

13.

COWEN, Chief Judge (concurring in part and dissenting in part):

With deference to the majority and with due recognition of the time and study which Judge Durfee and my associates who join with him have devoted to the consideration of this case, I am unable to agree with that portion of the court's opinion which relates to Cierva Patent No. 1,947,901, referred as to the '901 patent.

As the trial commissioner pointed out in his opinion, helicopters with power-driven rotary wings and gyroplanes with wind-driven (autorotation) rotary wings are both broadly old and both types are rotary wing aircraft. In resolving the issue, it is important to bear in mind that throughout the history of the prosecution and issuance of the '901 patent, claims of two different kinds were present in the application for the patent—first, claims which are concerned only with rotary wing aircraft and, second, claims which relate to aircraft containing both rotary wings and fixed aerofoils or wings. The original application (def. ex. 94) filed in 1930 presented more than 30 claims, including 14 claims which did not refer to or include a fixed wing and a number of others which recited a fixed wing as an element of the combination. Moreover, of the 30 claims included in the '901 patent, 14 do not recite or refer to fixed wings or areofoils. These are Claims 1, 2, 3, 18, 19 and 24 through 32.

The first sentence of the '901 patent application states that the invention relates to improvements in rotary wing aircraft disclosed in the applicant's earlier Patent No. 1,590,497. That patent, which was issued in 1926, disclosed a rotary wing aircraft without a fixed wing.

As shown in the trial commissioner's finding 25, Claim 3 of the '901 patent involved here, does not define relationships between the rotary wing system and a supplemental fixed wing. Instead, it pertains to a sustaining rotor construction having features of proportioning and disposition of the rotor blades, which are of airfoil section in a swingingly-pivoted arrangement and with the rotor blades having a positive incidence setting. Claim 3, tabulated to show the elements thereof, reads as follows:

In an aircraft,

1. a sustaining rotor construction having blades

(a) mounted for movement with respect to an axis member

(b) and so proportioned that, under the influence of air currents, the blades have an average autorotational speed at the tip substantially in excess of the maximum flight speed of which the craft is capable,

(c) the blades of the rotor being of an aerofoil section of substantially fixed centre of pressure,

(d) and arranged, with respect to the axis member, in such manner as to be free to assume positions of equilibrium between intertia and lift forces at various points in their general path of rotative travel

(e) and said blades being set at a positive incidence calculated with respect to the no-lift position relative to a plane perpendicular to the axis of rotation. [Indentation and numbering added.]

In describing the improvement of the invention covered by the '901 patent over the earlier '907 patent, the inventor states:

I have further found that I can best attain these desirable results, at least when employing substantially symmetrical blade sections, with an individual positive-incidence setting of the blades on their common axis, of preferably around 2° or 3°, but more than 5°, as compared with the substantially neutral setting illustrated in my said Patent No. 1,590,497. This is productive of two rather striking results: first, that at rather slow speeds of translational movement of the craft, the rotor operates at a somewhat slower speed of rotation than one with blades set at no-lift or at a slight negative incidence, but with increased lifting efficiency and decreased frictional resistance; and second, at higher

speeds of the craft, the rotor tends to run materially faster than its rotational speeds at low speeds of the craft, rather than slower or substantially constant as is respectively the case with rotors, in which the effective blade incidence is negative or neutral; all of which produces an important result, later to be considered.

Reference to the positive incidence setting of the rotor blades is made in six separate paragraphs of the specifications dealing with the purposes and advantages of the '901 invention.

The decision of the majority is based upon its conclusion that the term "so proportioned" in Claim 3 means a relationship between rotor blades and fixed wings. Since the accused helicopters have no fixed wings, the court holds that Claim 3 has not been infringed. In reaching that result, the majority relies primarily upon three quotations from the specifications. The first of these refers to a proportioning and disposition of the blades and blade system and the "relation thereof" to the fixed lifting surfaces. I interpret the first portion of the quotation as a reference to a proportioning of the rotor blades themselves in an aircraft without fixed wings for the purpose of achieving the results described in Claim 3. I read the second portion of the quotation as a statement that for other claims including both fixed and rotary wings, there is a relationship between the rotor blades and the fixed wing. There is no statement that the rotor blades are proportioned to the fixed wings.

The second quotation from the specifications in the court's opinion is no more than an illustrative embodiment of what the inventor conceived to be the best mode of using his invention, i. e., by employing it in an aircraft having both fixed and rotary wings. There is no reference in this second quotation to "proportioning" of the rotor blades.

The third quotation from the specifications appears in footnote 19 of the court's opinion. Here again is an illustrative embodiment of what the inventor consid-

ered the most advantageous use of his invention—a use to which the patent does not confine him. The quotation does not mention proportioning of the rotor blade system. Instead, the specification states that if one uses an aircraft combining both fixed and rotary wings in the particular embodiment of the invention there described, the total area of the fixed wings should be proportioned to the area of rotor blades within a range of 50 percent to 100 percent. When read in connection with the other claims, it is perfectly clear that Claim 3 covers only a sustaining rotor construction. In that context, the claim refers to a proportioning of the rotor blades to achieve the tip speed described. Therefore, I find no basis in the quotation for reading into Claim 3 a limitation that pertains only to a proportioning of the fixed wings to the rotor blades in aircraft where both types of wings are employed.

In my view, the court has utilized certain illustrative embodiments in the patent specifications for the purpose of engrafting on Claim 3, which does not involve fixed wing aircraft, a limitation which pertains only to fixed wing aircraft. It seems to me that such an interpretation is contrary to the holding of this court in Zonolite Co. v. United States, 149 F.Supp. 953, 958, 138 Ct.Cl. 114, 123, wherein the court stated:

> Patent specifications and drawings are not to be read so as to limit the scope of the claim recital where the claim recital is clear and unambiguous. While claims should be construed in the light of the specifications and drawings to obtain an understanding thereof, the illustrative embodiments specified are not to be read into the claims. See White v. Dunbar, 1886, 119 U.S. 47, 51–52, 7 S.Ct. 72, 30 L.Ed. 303. The claims alone define what is covered by the patent. See Kuhne Identification Systems, Inc. v. United States, 1936, 82 Ct.Cl. 237, 258.

The reason for the rule, particularly in cases where an illustrative embodiment that represents the inventor's conception of the best use of the invention is offered

as a defense to infringement, was set forth by the Supreme Court in Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908):

> We think it is clear that the court considered that Liddell sought to comply with § 4888 of the Revised Statutes. In other words, he filed a description of his invention, explained its principle, and the best mode in which he "contemplated applying that principle" and did not intend to give up all other modes of application. An inventor must describe what he conceives to be the best mode, but he is not confined to that. If this were not so most patents would be of little worth. [Footnote omitted]

Id. at 418, 28 S.Ct. at 751.

It is my conclusion that Claim 3 of the '901 patent defines an invention in which the rotor blades are so proportioned in shape, area, and incidence with relation to the weight of the aircraft as to produce a tip speed that gives greater efficiency in the operation of a rotary wing aircraft. That conclusion is based upon a consideration of the file wrapper, a study of the entire '901 patent, the prior art, and the testimony of expert witnesses—all as reflected in the trial commissioner's findings of fact.

In determining the meaning of the term "so proportioned," I would turn first to the application file. Connecticut Valley Enterprises, Inc. v. United States, 348 F.2d 949, 172 Ct.Cl. 468, 475 (1965); Mastini v. American Telephone & Telegraph Co., 236 F.Supp. 310, 314 (S.D. N.Y.1964).

The term "so proportioned" was used in several of the original claims in the '901 patent. For example, original Claim 22 referred to a proportioning of the rotor blades so that under the influence of air currents, the blades would have a rotational speed as described. No reference was made to fixed wings. Claim 22 was amended to state that the blades were "so proportioned with respect to the weight of the craft." (def. ex. 49, p. 24). In seeking the allowance of Claim 22, the applicant argued (def. ex. 49, p. 122) that "the claim as amended brings out the proportioning of the blades with respect to the weight of the craft in such manner that even with a positive-lift incidence setting the tip speed will have the relationship set forth in the claim." Thus, it is clear that the term "so proportioned" has been in the '901 patent disclosure since the application was filed in 1930. Since the definition given by the applicant was not questioned by the Patent Office, it seems to me that the inventor's interpretation should be controlling. It should also be noted that in the application, Claims 1–4 (def. ex. 49, pp. 16–17), Claims 18–20 (def. ex. 49, pp. 23–24), and Claim 30 (def. ex. 49, pp. 28–29) included no references to fixed wing aircraft.

It is proper to look at other claims in the patent to determine the interpretation of a particular claim involved in a case. United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). In reaching its interpretation, the majority has compared Claim 3 with Claims 4–7 and 8–17, all of which refer to a fixed wing or fixed aerofoil. However, I would contrast Claim 3 with Claim 4 and compare Claim 3 with Claim 18. Claim 4, which relates to aircraft having both rotary and fixed wings, reads as follows:

> 4. In an aircraft, a sustaining rotor construction having blades mounted for movement with respect to an axis member and so proportioned that, under the influence of air currents, the blades have an average rotational speed at the tip substantially in excess of the translational flight speed of which the craft is capable, the blades of the rotor being arranged, with respect to the axis member, in such manner as to be free to assume positions of equilibrium between inertia and lift forces at various points in their general path of rotative travel, *together with a substantially fixed aerofoil of an effective area approximately 50% to 100% of the area of the rotative blades.* [Emphasis supplied.]

It is noteworthy that the first portion of Claim 4, like Claim 3, refers to a proportioning of the rotor blades to attain the tip speed described. By contrast, the last clause in Claim 4, which includes a fixed wing, recites a specific percentage of the area of the fixed wing to the area of the rotative blades.

Claim 18, which covers rotary wing aircraft, states in part as follows:

* * *; said wings having in flight, when at an intermediate position of pivotation, an average autorotational incidence which is at positive-lift with relation to a plane perpendicular to the axis of rotation; the elongated form, the area and the average incidence of said rotative wings being *so proportioned with relation to the weight of the craft* that with the full burden of sustention falling upon said rotor the wings thereof have an average rotational speed at the tip greater than the top forward speed of which the craft is capable under the influence of said forward proplusion means. [Emphasis supplied.]

Since Claim 3 recites no fixed wing, I would utilize the underlined statement in Claim 18 for determining the proper interpretation of the term "so proportioned" as it is used in Claim 3.

The defendant contends that the trial commissioner's ultimate findings of fact and recommended conclusions of law are based entirely upon the language of Claim 3 without regard to other pertinent evidence. A mere reading of the findings demonstrates the complete inaccuracy of that contention and shows that the findings on validity and infringement resulted from a two-step process:

First, a determination of the meaning of Claim 3 from a consideration of all the relevant evidence, including the patent, the application file, the prior art, and the testimony of many witnesses.

Second, a determination that the accused helicopters do substantially the same work in substantially the same way and accomplish the same result as the invention recited in Claim 3.

In its relatively few exceptions that comply with the rules of this court, defendant has relied upon certain parts of the patent specifications to support its argument that Claim 3 is concerned exclusively with rotary wing aircraft having supplemental fixed wings. In my judgment, the trial commissioner's findings 11–23, 362, 364, 366, 368, 380 and 381 effectively dispose of the fixed wing defense. His findings 24–45, inclusive, deal with the features of the invention disclosed in Claim 3, and are based upon the specifications, the drawings, the file wrapper, and the testimony of the witnesses. Such findings, both evidentiary and ultimate, sustain a conclusion that the subject matter of Claim 3 is not limited to fixed wing aircraft. In his findings 48 to 56, inclusive, 57 to 65, inclusive, and 66 to 74, inclusive, the trial commissioner has shown in clear detail how the accused helicopters incorporate the combination of elements defined in Claim 3 of the '901 patent, operate in the same manner, and produce the same result. Since each of the findings enumerated above is well supported by the record, I would adopt them as separate findings of fact and as the basis for a conclusion of law.

Under our rules and especially in a case like this where a vast amount of evidence is offered by both parties and where there is conflicting testimony of expert witnesses, the trial commissioner's findings are presumed to be correct. In my opinion, the defendant has not made the strong affirmative showing that would justify the rejection of such findings. Davis v. United States, 164 Ct.Cl. 612, 616–617 (1964); Dodge Street Building Corp. v. United States, 341 F.2d 641, 644, 169 Ct.Cl. 496, 501 (1965). It seems to me that a careful adherence to our rule is called for in this case. The record is one of the most voluminous that has ever been presented in litigation in this court. The determination of the many factual issues requires not only a balancing of the credibility of the witnesses and an assessment of the weight to be accorded to the documentary evi-

dence but a knowledge and understanding of the scientific principles so extensively involved in this action. In view of the training and experience of the trial commissioner in such matters, I would not disturb his findings of fact with respect to the '901 patent on the basis of what I regard as an inadequate showing to the contrary.

For the reasons stated above, I would hold that Claim 3 of the '901 patent is valid and has been infringed. As to the other patents involved in this action, I concur in the court's decision.

COLLINS, Judge, joins in the foregoing opinion, concurring in part and dissenting in part.