82 F.3d 435
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
YAMAHA CORPORATION, Plaintiff-Appellant,
v.
ESS TECHNOLOGY, INC., Defendant-Appellee.
 No. 95-1362.
 United States Court of Appeals, Federal Circuit.
 March 29, 1996.
Rehearing Denied April 19, 1996.
 
 Before CLEVENGER, SCHALL, and BRYSON Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 Yamaha Corporation (Yamaha) seeks review of the decision of the District Court for the Central District of California, Yamaha Corp. v. ESS Technology, Inc., No. CV 95-1660-KN (C.D.Cal. May 1, 1995), denying Yamaha's preliminary injunction motion. We affirm.
 
 
 2
 * ESS Technology, Inc. (ESS) manufactures the ES1488 and ES1688 sound synthesis chips which employ a form of feedback to eventually produce a tone. In ESS's devices, a waveform memory creates an output which is then fed-back and processed to create the next output. This feedback process is repeated twenty eight times; during each of these twenty eight iterations, the waveform memory output is fed-back to create the next output but is never fed-forward to the portion of the circuitry which produces the tone. On the twenty ninth iteration, the waveform memory output is fed-forward for tone production but is not fed-back to produce another output.
 
 
 3
 Yamaha seeks to preliminarily enjoin ESS from making, using, or selling the above products that Yamaha alleges infringe United States Patent Nos. 4,249,447 (the '447 patent) and 4,813,326 (the '326 patent). The '447 patent describes a method for increasing the range of tone colors which can be produced by digital tone synthesis. Fig. 1, reproduced below, shows the basic organization of the invention.
 
 
 4
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 5
 The range of tone colors is increased by using a given output signal from an arithmetic unit to create the next output signal. Yamaha refers to this technique as "Feedback FM."
 
 
 6
 The '326 patent discloses another method of increasing the range of tone color. This patent teaches how to create additional harmonics by varying the shape of the modulating and/or carrier waves employed by the prior art FM tone synthesis.
 
 
 7
 After considering Yamaha's motion for a preliminary injunction, the district court concluded that Yamaha had not established a likelihood of success on the merits. In addition, the district court decided that Yamaha had not shown that it would be irreparably harmed; the balance of hardships favored ESS; and the public interest counseled against enjoining ESS. As a result, the district court denied Yamaha's motion. Yamaha appeals this decision, and we have jurisdiction to review it pursuant to 28 U.S.C. §§ 1292(a)(1), (c)(1) (1994).
 
 II
 
 8
 A preliminary injunction is an extraordinary remedy, the grant or denial of which lies within the district court's discretion. New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 881, 23 USPQ2d 1622, 1625 (Fed.Cir.1992). In making its decision, the district court must weigh and balance four factors, none of which alone is dispositive: (1) whether the movant has established a reasonable likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not granted; (3) whether the balance of hardships tips in favor of the movant; and (4) whether issuance of the injunction would be in the public interest. Chrysler Motors Corp. v. Auto Body Panels, Inc., 908 F.2d 951, 952-53, 15 USPQ2d 1469, 1470-71 (Fed.Cir.1990). Because the ultimate decision of whether or not to grant the injunction lies within the district court's discretion, we will overturn the district court's decision only if it amounts to an abuse of discretion or error of law. Id. at 953, 15 USPQ2d at 1471.
 
 
 9
 On appeal, Yamaha contends that the district court's entire analysis was tainted by its erroneous claim interpretations. Under a correct interpretation of these claims, Yamaha argues, it has demonstrated a strong likelihood of success on the merits and is therefore entitled to a presumption of irreparable harm. See Smith Int'l, Inc. v. Hughes Tools Co., 718 F.2d 1573, 1581, 219 USPQ 686, 692 (Fed.Cir.), cert. denied, 464 U.S. 996 (1983). The presumption of irreparable harm, in turn, would tip the balance of hardships in its favor and entitle it to the preliminary injunction.
 
 III
 
 10
 The determination of whether a patent claim is infringed requires a two-step analysis. First, the claim must be construed as a matter of law to determine its scope and meaning. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.) (in banc), cert. granted, 116 S.Ct. 40 (1995). Second, the claim as properly construed must be compared to the accused device. Id.
 
 
 11
 A. Likelihood of Success on the Merits--the '447 Patent
 
 1. Claim interpretation
 Claim 1 of the '447 patent recites:
 
 12
 A method for producing a tone by reading a waveform memory storing a predetermined waveform by an address signal of a selected repetition frequency comprising:
 
 
 13
 a step of multiplying the output of said waveform memory with a parameter;
 
 
 14
 a step of adding the multiplication product to said address signal; and
 
 
 15
 a step of reading said same waveform memory by means of the output resulting from said addition,
 
 
 16
 a tone being produced by using the output of said same waveform memory.
 
 
 17
 (emphasis added).
 
 
 18
 The district court decided that the "output of said same waveform memory" in the last clause must be identical to that in the first step. Based on its interpretation of that phrase, the district court concluded that claim 1 requires that the same output from the waveform memory be simultaneously fed-back and fed-forward, with a tone being produced after downstream processing. Because ESS's device at no time feeds back the same output as it feeds forward, the district court decided that Yamaha was not likely to prove literal infringement.
 
 
 19
 On appeal, Yamaha challenges the district court's claim interpretation of these two key phrases. Yamaha admits that the term "output" in the last clause of the claim generally refers to the same "output" in the first step of the claim. Yamaha insists, however, that because of the timing delay involved in the arithmetic unit, the "output" in the first step need not be the same data value as used in the last clause to produce a tone. Moreover, even if the two outputs are identical, Yamaha contends that "by using" is an expansive phrase which merely requires that the output be somehow used to create the ultimate tone. Based on these interpretations, Yamaha argues that the same output need not be simultaneously fed-back and fed-forward to produce a tone.
 
 
 20
 We interpret the claim in view of its language, the specification, and the prosecution history. Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578, 37 USPQ2d 1365, 1370 (Fed.Cir.1996). As explained below, we agree with the district court and likewise reject Yamaha's proffered interpretation.
 
 
 21
 We begin first with Yamaha's contention that the output in the last clause need not be the same data value as that in the first step. By using a definite article "the" to describe "output" in the last phrase, Yamaha raises the inference that the term refers to the same value as in the first step. Cf. Zenith Elecs. Corp. v. Exzec, Inc., No. 93-C-5041, 1995 WL 275591, at * 5 (N.D.Ill. May 8, 1995) (stating that a definite article such as "the" refers back to an earlier recitation of the element); accord Slimfold Mfg. Co. v. Kinkead Properties, Inc., 626 F.Supp. 493, 495, 229 USPQ 298, 299 (N.D.Ga.1985), affirmed, 810 F.2d 1113, 1 USPQ2d 1563 (Fed.Cir.1987). The diction chosen by Yamaha therefore suggests that the two uses of "output" refer to identical data values.
 
 
 22
 To respond to this strong inference, Yamaha notes that the third step of the claim creates another output from the waveform memory, albeit an implicit one. Therefore, Yamaha argues, it makes no sense to require that the output value in the last clause be the same value created by the first step; the last clause could as well refer to the output value created by the third step.
 
 
 23
 We disagree with Yamaha's argument. If Yamaha meant for "the output" in the final clause to refer to a different value in time from that in the first step, it could have explicitly so stated.* For example, the claim could have been written so that in the last clause, the tone is produced by using "an output" or "the output of the waveform memory in the third step" as opposed to that in the first step. Instead, there is no mention whatsoever of any output that may be created by the third step.
 
 
 24
 Yamaha's interpretation would change "the" in the last clause to "an." The claim, however, cannot bear such a weight. Unless there exists a strong indication to the contrary, Yamaha must live with its choice of claim language and the inferences to be drawn therefrom. The language of the claim therefore supports the interpretation requiring the same output value to be both fed-forward and fed-back.
 
 
 25
 This interpretation also finds support in the specification. Although claims are not limited to particular embodiments described in the specification, such embodiments may inform the meaning of terms within the claims. See Autogiro Co. v. United States, 384 F.2d 391, 397-98, 155 USPQ 697, 702-03 (Ct.Cl.1967). In the '447 patent, the basic organization of the invention is described by Fig. 1. This figure admittedly does not depict timing elements; yet the junction following the sinusoid memory (23' at the point labeled sin y) indicates that the same data value is simultaneously both fed-forward (as shown by the arrow pointing to the right) and fed-back to the multiplier 13. Fig. 1, therefore, supports the district court's interpretation.
 
 
 26
 Fig. 16, which describes the subject matter in claim 3, is also instructive because only claims 1 and 3 twice use the output of said waveform memory. Claim 3 recites "a step of multiplying the output of said waveform [memory] with a first parameter; ... a step of multiplying the output of said waveform memory with a second parameter." Fig. 16 reveals that the same output signal of the waveform memory undergoes both multiplication steps. Because the multiplication operations on the memory output in claim 3 lack the timing delays involved with the arithmetic unit in claim 1, there is no reason to believe that the output value applied to the first multiplier 13-1 in claim 3 differs from the value applied to the second multiplier 28. Instead, Fig. 16 indicates that both uses of "output" refer to the same data value. This use in claim 3 again lends support to the district court's interpretation of claim 1.
 
 
 27
 In fact, each of the drawings in the specification indicate that the same output value is both fed-forward and fed-back. In addition to Figs. 1 and 16 described above, Figs. 17, 19, and 24 also depict the output being directly both fed-back and fed-forward. Only in Fig. 9 is the output not directly fed-forward, but even in that case it is clear that the same value fed-back via multiplier 13-1 is also fed-forward to multiplier 27, albeit via multiplier 13-1. In contrast to the inferences created by these drawings of the specification, Yamaha points to no drawings, timing diagrams, or language in support of its interpretation that the last clause in claim 1 refers to an output value of the waveform memory in general, without reference to time. The description in the specification, therefore, weighs in favor of the interpretation adopted by the district court.
 
 
 28
 In light of the claim language and the specification, we agree with the district court that claim 1 requires that the output value in the first step be the same as the output value in the last clause. The identity of these two outputs, in turn, supports the district court's overall interpretation of the claim as requiring that the same signal be simultaneously both fed-back in the first step of the claim and fed-forward in the last clause.
 
 
 29
 Despite this interpretation of "output," Yamaha insists that the same output value need not be simultaneously fed-back and fed-forward. Yamaha argues that the claim employs the broad phrase "by using," which requires only that the output eventually be used to produce a tone. In support, Yamaha notes that the specification and all of the drawings recognize that some additional downstream processing will always be required before the waveform memory output is converted into a tone.
 
 
 30
 This broad reading of "by using" would encompass ESS's device; in each iteration, the output is used to create the next output, with the twenty ninth output being the only one fed-forward to produce a tone. Indirectly, then, each output of ESS's device is used to create the ultimate tone. We, however, disagree with Yamaha's overbroad characterization of this phrase.
 
 
 31
 As Yamaha itself explains, the first three steps of the claim refer to feedback. The last clause, in contrast, refers to the feed-forward aspect of the claim--the downstream processing necessary to convert the waveform memory output into a tone. Although the phrase "by using" encompasses such downstream processing, it does not necessarily encompass any processing that occurs during additional feedback. Indeed, the prosecution history of claim 1 confirms our view that the phrase "by using" points to downstream processing, rather than indirect use during the feedback cycle.
 
 
 32
 Claim 1 as originally filed was substantially similar to the claim as issued except that the last clause as originally filed read: "a tone being produced by using the output of said waveform memory or said multiplication product." (emphasis added). Fig. 1 shows that this multiplication product, labeled J>sin y, occurs within the feedback loop. As originally filed, then, the claim contemplated a tone being produced "by using" either downstream processing or processing within the feedback loop.
 
 
 33
 The examiner rejected this original claim, inter alia, as drawn to an invention not disclosed because "the phrase 'or said multiplication product' cannot be understood as it appears that the tone would be produced only from the output of the waveform memory." In response, Yamaha deleted the objectionable phrase and stated "[t]he claim as amended is clearly drawn to an invention which is disclosed, for example in Fig. 1."
 
 
 34
 By eliminating the output of the multiplication product as a source used to produce a tone, Yamaha's amendment indicated that the tone was to be produced via the feed-forward mechanism rather than the feedback mechanism. Therefore, although "by using" may be broad, it is not without bounds, and does not support Yamaha's view.
 
 
 35
 In sum, we agree with the district court's interpretation of "the output of said waveform memory." Based on this interpretation, we also agree that the claim requires that the same output value be simultaneously fed-back and fed-forward.
 
 2. Infringement
 
 36
 Based upon this claim interpretation, the district court determined that Yamaha could not likely show that ESS's chip infringed either literally or under the doctrine of equivalents. Literal infringement exists if the accused device includes every claim limitation. Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1582, 34 USPQ2d 1120, 1126 (Fed.Cir.), cert. denied, 116 S.Ct. 272 (1995). The judge determined that ESS's device repeats the first three steps of claim 1 twenty eight times, and on the twenty ninth time, ESS's device sends the output signal downstream. During the first twenty eight iterations, the output signal is fed-back but not forward; on the twenty ninth iteration, the output signal is fed-forward but not back. Because ESS's device never simultaneously feeds-back the same signal it feeds-forward, the district court held, in sound exercise of its discretion, that Yamaha was unlikely to prove literal infringement.
 
 
 37
 The district court judge also recognized that infringement may be found under the doctrine of equivalents if the accused device contains only insubstantial differences from the claimed apparatus. See Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc., 62 F.3d 1512, 1521-22, 35 USPQ2d 1641, 1648 (Fed.Cir.1995) (in banc), cert. granted, 1995 WL 668878 (Feb. 26, 1996) (No. 95-728).
 
 
 38
 Before the district court, Yamaha made only conclusory arguments that ESS's device performs the same function, with the same result, and in the same way as the claimed device. The district court was not persuaded and instead concluded that ESS's product appears to achieve a similar result but in a fundamentally different way than does Yamaha. As a result, the district court concluded that, on the record before it, "a showing of infringement under the doctrine of equivalents is also unlikely." This conclusion, especially in light of Yamaha's conclusory remarks, is within the sound discretion of the district court.
 
 
 39
 B. Likelihood of Success on the Merits--the '326 Patent
 
 
 40
 1. Claim interpretation.
 
 Claim 1 of the '326 patent recites:
 
 41
 In a method for synthesizing a musical tone signal on the basis of a predetermined modulation operation employing a modulating signal and a carrier signal, wherein a predetermined waveshape signal is generated in accordance with a stored waveshape table and is used for defining at least one of a modulating wave function and a carrier wave function, wherein the predetermined waveshape signal is a periodic signal having a regularly progressing form within each period, the steps comprising:
 
 
 42
 specifying a phase section of each period of the waveshape signal, said phase section including plural table values and being less than one period of the waveshape signal;
 
 
 43
 modifying the waveshape signal in the specified phase section to provide a modified waveshape signal which has a different form in the specified phase section than that of the remainder of the waveshape signal; and
 
 
 44
 executing said modulation operation by utilizing the modified waveshape signal as said modulating signal or said carrier signal.
 
 
 45
 (emphasis added).
 
 
 46
 The disputed issue with respect to this claim is the meaning of the words "stored waveshape table." The district court construed this phrase as "requiring the use of some type of memory, such as a ROM." Yamaha contends that this interpretation is unduly narrow.
 
 
 47
 The ordinary meaning of "stored" is data retained in a device from which it can be copied or obtained at a later time. See The New IEEE Standard Dictionary of Electrical and Electronics Terms 1296 (5th ed.1993). A "waveshape" is "[t]he graph of the wave as a function of time." Id. at 1485. Finally, a "table" is "[a]n array of data, each item of which may be unambiguously identified by means of one or more arguments." Id. at 1335.
 
 
 48
 Defined in this manner, the claim requires that an array of data representing the wave as a function of time be retained in a device for subsequent retrieval. This definition is equivalent to that of the district court because the New IEEE Dictionary of Electrical and Electronics Terms defines "memory" as "[a]ny device in which information can be stored...." Id. at 979, 1294.
 
 
 49
 Although an inventor may be his own lexicographer, Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1580, 36 USPQ2d 1162, 1165 (Fed.Cir.1995), nothing in the specification indicates that these terms are to have other than their ordinary meanings. Similarly, the prosecution history reveals that the words "stored waveshape table" were added for clarification, but it does not indicate that the words had extraordinary meaning. We therefore agree with the district court's interpretation of "stored waveshape table."
 
 2. Infringement
 
 50
 Based upon this claim interpretation, the infringement inquiry becomes whether ESS's device retains an array of data representing the wave as a function of time for subsequent retrieval. The district court concluded that Yamaha had not shown it was likely to prove literal infringement because ESS's device uses logic gates, rather than some form of memory, to generate the waveform. We find no error in that conclusion.
 
 
 51
 The district court analyzed infringement under the doctrine of equivalents in the same manner as it did for claim 1 of the '447 patent. In both cases, Yamaha made only conclusory remarks; and in both cases, the district court concluded that ESS's device likely achieved a similar result but in a fundamentally different way. For the same reasons explained above, we do not find this conclusion clearly erroneous.
 
 
 52
 In sum, we conclude that the district court did not abuse its discretion by deciding that Yamaha had not shown a likelihood of success on the merits with respect to infringement of claim 1 of the '326 patent.
 
 C. Irreparable Harm
 
 53
 Because Yamaha has not made a strong showing as to likelihood of success on the merits, it is not entitled to a presumption of irreparable harm. Nutrition 21 v. United States, 930 F.2d 867, 871, 18 USPQ2d 1347, 1350-51 (Fed.Cir.1991). The district court concluded that without this presumption, Yamaha had not proven irreparable harm. The district court explained that "[m]ost of Yamaha's hardship arguments are based on the assumption that the chips in fact infringe." Yamaha's only independent evidence on the issue consists of two conclusory statements by Mr. Ishimoto, Yamaha's General Manager of the Semiconductor Department of its Electronic Devices Division.
 
 
 54
 In his affidavit, Mr. Ishimoto states that based on sales of over 20 million chips in the past four years, "Yamaha's sound generation chips are deemed by Yamaha to be critical to its financial well-being." Moreover, Mr. Ishimoto states that sales by ESS "will cause severe financial damage to Yamaha if left unchecked" because it will encourage others to enter the market.
 
 
 55
 The evidence, however, reveals that in fiscal year 1994, Yamaha had total sales of 445.607 billion yen. Of these sales, personal computer sound chips accounted for 9.119 billion yen. Therefore, the sound chip technology involved in this case amounts to approximately two percent of Yamaha's total sales.
 
 
 56
 Based upon this evidence, the district court did not abuse its discretion in concluding that Yamaha had not shown that it would be irreparably harmed.
 
 D. Balance of Hardships
 
 57
 Against the aforementioned evidence of harm that Yamaha would suffer if a preliminary injunction was not granted, the district court considered the harm that ESS would suffer if the injunction was granted. Based on the declaration of Nicholas Aretakis, ESS's Vice President of Sales, the district court concluded that the balance of hardships favored ESS.
 
 
 58
 Mr. Aretakis projected that 63% of ESS's sales for fiscal year 1995 would derive from the accused chips. In addition, Mr. Aretakis explained that ESS had discovered a market niche for compact sound synthesis chips for use in portable multimedia computers. ESS currently has a window of opportunity to exploit this market niche because no other company has designed a similar chip. If the preliminary injunction is granted, he asserts that this window will almost certainly close before ESS could resume.
 
 
 59
 Based on this declaration, we cannot say that the district court abused its discretion in deciding that the balance of hardships favored ESS.
 
 E. Public Interest
 
 60
 ESS also introduced evidence that several third-party computer manufacturers will suffer hardship if the preliminary injunction is granted. These companies had designed products requiring ESS's integrated chips, and any redesign would cause significant lost sales. The district court considered this evidence and concluded that the public interest would be furthered by making ESS's chips available in order to promote advancement in the personal computer industry.
 
 
 61
 Yamaha responds that public policy favors protection of the rights secured by valid patents, and challenges ESS's evidence as insufficient to turn the public interest in ESS's favor. Because Yamaha failed to show a likelihood of success on the merits, we cannot fault the district court for considering the impact of a preliminary injunction on third parties. The district court did not abuse its discretion in deciding that the public interest counseled against granting the preliminary injunction.
 
 F. Conclusion
 
 62
 Based on the evidence before us, we conclude that the district court did not err in interpreting claim 1 of the '447 patent or claim 1 of the '326 patent. Nor did the district court abuse its discretion in concluding that the four factors counseled against granting a preliminary injunction to Yamaha. We therefore affirm the district court's decision.
 
 
 63
 No costs.
 
 
 
 *
 Indeed, claims 2 and 3 each use words such as: "first parameter" and "second parameter;" "the multiplication product" and "second multiplication product;" and "the waveform memory" and "second waveform memory." Apparently, Yamaha's attorney knew how to refer to different signal values when desired