Donald S. KUDLACEK, Plaintiff/Counterclaim Defendant/Third Party Defendant–Appellant,

v.

DBC, INC. (doing business as Specialty Archery Products), and Donald I. Chipman, Defendants/Counter–claimants–Appellees,

and

Robert E. Shoemake and Jessie Morehead, Third Party Plaintiffs–Appellees.

No. 01–1149.

United States Court of Appeals, Federal Circuit.

DECIDED: Dec. 21, 2001.

Before CLEVENGER, GAJARSA, and DYK, Circuit Judges.

CLEVENGER, Circuit Judge.

In this patent infringement suit, Donald S. Kudlacek appeals from a decision of the United States District Court for the Northern District of Iowa granting summary judgment of noninfringement to DBC, Inc., and Donald I. Chipman, doing business as Specialty Archery Products (collectively, "Specialty"). *Kudlacek v. DBC, Inc.*, 115 F.Supp.2d 996 (N.D.Iowa 2000). We *affirm.*

I

Mr. Kudlacek developed and sells an archery bow stabilizer, which, as the name suggests, stabilizes archery bows by absorbing bow vibrations caused by an archer's release of the bowstring. Kudlacek received a patent on his bow stabilizer: U.S. Patent No. 5,611,325 ("the '325 patent"). As described in the '325 patent and illustrated in Figure 1 below, the Kudlacek bow stabilizer consists of at least three stabilizer rods 18 mounted to a base member 10, which is attached to the bow 14. When the archer releases the bowstring, the stabilizer rods transmit the vibration to attached weights and adjustment members, which dampen the vibration.

'325 Patent, Figure 1.

At least one adjustment member 22 (also called a "tuning slide member") fits along the rods. Figure 2 of the '325 patent, shown below, shows a cross-section of an adjustment member. The adjustment members have bores 24 through them to accommodate the stabilizer rods. The bores are wider than the rods so that the rods have room to vibrate. '325 Patent, col. 2, II. 18–19. The archer secures the adjustment members to the rods with a "resilient securing means," which in the preferred embodiment is a screw 26 with a resilient pad 28 attached to its tip. Tight-ening the screw presses the resilient pad onto the rod, which secures the adjustment member to the rod and "results in the absorption of greater vibration energy, with corresponding greater reduction in vibration of the archery bow." '325 Patent, col. 2, II. 27–29. The adjustment members are adjustable in two senses: first, the archer can slide them up and down the length of the rods and secure them in any location, and second, the archer can adjust the tightness with which the "resilient securing means" grips each rod. This allows the stabilizer to be adjusted more precisely for each individual bow and archer.

'325 Patent, Figure 2.

Specialty also makes archery equipment, including bow stabilizers. Like the invention described in the '325 patent, Specialty's Super Stix stabilizer includes a plurality of stabilizer rods mounted to a base member for attachment to a bow. The Super Stix also includes an adjustment member that tunes the vibration damping attributes of the stabilizer. As ably described by the district court, the Super Stix adjustment member consists of "four separate pieces that come together to form channels through which the stabilizer rods pass." *Kudlacek*, 115 F.Supp.2d at 1010. The Super Stix also contains resilient pads, in the form of rubber O-rings placed around the stabilizer rods. The four pieces of the Super Stix adjustment member "are held together by rigid screws that pass through the outer edges of the adjust-

ment member, but do not extend into the channels through which the stabilizer rods pass." *Id.* Tightening the screws causes the adjustment member to press down on the rubber O-rings, thus securing the adjustment member to the rods.

On May 20, 1999, Kudlacek filed suit against Specialty, alleging that the Super Stix infringes claim one of the '325 patent. *Id.* at 1002. Specialty denied infringement, counterclaimed for a declaratory judgment of noninfringement and invalidity, and–together with third party plaintiffs Robert Shoemake and Jessie Morehead–brought a second counterclaim against Kudlacek alleging that his Adjustable Control Peep product infringes U.S. Patent No. 5,137,007 (the aptly-named " '007 patent"), directed towards an "Archery Shooting Control System." *Id.* at 1002–3.

Specialty filed separate motions for summary judgment of noninfringement and invalidity of the '325 patent, and Kudlacek filed a cross-motion for summary judgment of noninfringement of the '007 patent. In an exceedingly thorough opinion on the summary judgment motions, the district court construed the pertinent claim terms that were disputed by the parties. We discuss herein only those portions of the court's opinion relevant to the issues on appeal, which relate solely to the summary judgment motions concerning infringement of the '325 patent by the Super Stix product.

Kudlacek only asserted infringement of claim one of the '325 patent, which recites:

An archery bow stabilizer, comprising:

a) a base member configured for attachment to an archery bow handle,

b) at least three elongated stabilizer rods each having an inner end and an outer end,

c) anchor means on the base member securing the inner ends of the stabilizer rods thereto with the rods extending forwardly therefrom substan-

tially parallel to and spaced apart circumferentially from each other,

d) at least one vibration dampener adjustment member having openings there through matching the number and circumferential spacing of said stabilizer rods and a diameter larger than the diameter of said stabilizer rods freely receiving said rods therethrough, and

e) *resilient securing means on the vibration dampener adjustment member extending into each of said openings* and resiliently engaging and securing said adjustment member to said stabilizer rods intermediate the inner and outer ends of said rods.

'325 Patent, col. 2, I. 65—col. 3, I. 16 (emphasis added).

At the urging of both parties, the district court construed the "resilient securing means" limitation in subsection (e) of claim one under 35 U.S.C. § 112 ¶ 6. The court then identified the claimed function, which it held to be " 'resiliently engaging and securing' the adjustment member to the stabilizer rods. . . ." *Kudlacek*, 115 F.Supp.2d at 1028. The court then proceeded to identify, as required under § 112, ¶ 6, the structure in the written description that corresponds to the "resilient securing means" claimed in subsection (e) of claim one. *Id.* at 1028–29. The district court identified what it viewed to be the pertinent structure in the description of the preferred embodiment:

A *set screw* 26 is mounted in each tuning member 22 in registry with each through bore 24, *and a resilient pad is mounted on the inner end of each screw for releasably engaging the associated stabilizer rod 18. It is by this provision of the set screws 26 and pads 28 that each tuning slide member 22 may be released from the stabilizer rods 18* and slid along the length of said rods to

selected positions which maximize the dampening of vibrations in a variety of archery bows as an arrow is shot from the bow. *The set screws with pads then are tightened against the rods to secure the tuning slide members in their selected positions.*

\* \* \* \* \* \*

Adjustment of the tuning slide members 22 along the stabilizer rods 18 and *securing them in the enlarged bores 24 by the set screws 26 with resilient pads 28,* achieves the precise tuning of the archery bow, as demonstrated by tighter grouping of arrows in a target, as compared with stabilizers of the prior art. *Freedom of movement of the stabilizer rods* in the enlarged bores 24 and at the unrestrained outer weighted ends 30, *permitted by the resilient pads 28,* results in the absorption of greater vibration energy, with corresponding greater reduction in vibration of the archery bow.

*Id.* at 1029 (quoting '325 Patent, col. 2, II. 18–19 & 44–54). The court noted that the patent describes only one embodiment, and that the above-quoted language within the description of that embodiment contains the only identification of any structure for engaging and securing the adjustment member to the rods. *Id.* at 1030. The district court concluded that the corresponding structure was "both the set screws 26 and resilient pads 28, with the resilient pads 'mounted on the inner end of each set screw,' not merely resilient pads pushed into place by separate set screws in some other configuration." *Id.* (quoting '325 Patent, col. 2, II. 20–21) (internal citation omitted). In addition, the court held that the location of the set screw and pad assembly, rather than just the assembly itself, constitutes part of the pertinent "structure" corresponding to the resilient securing means limitation. Specifically, the court required that the set screw be "mounted in each tuning member 22 in registry with each through bore 24...." *Id.* at 1031 (quoting '325 Patent, col. 2, II. 18–21). In other words, the court found that the corresponding structure required the set screw to extend from the adjustment member down into the bore as shown in Figure 2 above.

The district court denied Specialty's motion for summary judgment of invalidity because material issues of fact remained as to whether invalidating sales occurred over one year before Kudlacek filed the application that matured into the '325 patent. *Id.* at 1039. However, the court granted both Kudlacek's and Specialty's motions for summary judgment of noninfringement. *Id.* at 1076. With respect to infringement of the '325 patent, the court held that the Super Stix does not contain the resilient securing means of subsection (e), because the set screws are not " 'mounted in each tuning member 22 in registry with each through bore 24,' but instead pass through the outer edges of the pieces of the adjustment member without ever contacting the 'through bores' or the 'resilient pads,' in this case the O-rings (28), and the O-ring 'resilient pads' are *not* 'mounted on the inner end of each set screw.' " *Id.* at 1047 (quoting '325 Patent, col. 2, II. 18–21).

The parties stipulated to dismissal of the claims remaining for trial, and the district court entered final judgment dismissing those claims without prejudice. This appeal by Kudlacek followed, vesting us with jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). Specialty did not appeal the court's entry of summary judgment of noninfringement of the '007 patent, so the only issues on appeal before this court concern the district court's claim construction and infringement analysis of the '325 patent.

## II

Summary judgment may be granted if "the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review a district court's grant of summary judgment without deference. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378, 53 USPQ2d 1225, 1227 (Fed.Cir.1999).

 Determining whether an accused device infringes a patent claim is a two-step process. In an appeal of summary judgment of noninfringement, this court reviews the first step of the infringement inquiry, determining the meaning and scope of the patent claims as a matter of law, without deference to the trial court. *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971, 50 USPQ2d 1465, 1467 (Fed.Cir.1999). Furthermore, "[c]laim construction of a [35 U.S.C.] § 112 ¶ 6 limitation includes identifying the claimed function and determining the corresponding structure or act disclosed in the specification, both of which are questions of law that this court reviews independently." *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430, 54 USPQ2d 1129, 1133 (Fed.Cir.2000). Review of the second step, comparing the properly construed claims to the accused device, "consists, first, of a de novo determination of whether any genuine issue of material fact exists, and second, if there is no genuine issue of material fact, a de novo review of whether the party was entitled to a judgment as a matter of law...." *Karlin Tech.*, 177 F.3d at 974, 50 USPQ2d at 1470.

## A

### Claim Construction

We turn now to the first step of the inquiry: construction of the disputed claim terms as a matter of law. On appeal, Kudlacek challenges only the district court's construction of the "resilient securing means" limitation in subsection (e) of claim one. As an initial matter, we note that the parties do not dispute that "resilient securing means" recites means-plus-function language and should be interpreted under § 112, ¶ 6. Nor do they dispute the district court's identification of the function of the resilient securing means as "'resiliently engaging and securing' the adjustment member to the stabilizer rods...." *Kudlacek*, 115 F.Supp.2d at 1028. Thus, we will focus directly on the issue under dispute: whether the district court properly identified the structure corresponding to the resilient securing means and whether that structure includes the location and direction of the set screw and pad assembly.

As the district court noted, the written description contains only one reference to a structure that performs the function of resiliently engaging and securing the adjustment member to the stabilizer rods, and it is to this language that we must look to find the structure corresponding to the claimed resilient securing means. The description of the preferred embodiment states that "[a] *set screw 26* is mounted in each tuning member 22 in registry with each through bore 24, *and a resilient pad 28 is mounted on the inner end of each set screw for releasably engaging the associated stabilizer rod 18.*" '325 Patent, col. 2, ll. 18–22 (emphases added). We think it beyond cavil that this language identifies both a screw and a pad as required components of the "resilient securing means." The specification could not be clearer on this point: "The *set screws with pads* then are tightened against the rods *to secure* the tuning slide members in their selected positions." '325 Patent, col. 2, ll. 27–29 (emphases added).

Kudlacek does not dispute that pads and screws are required, but contends that the district court erred by requiring the pad to be mounted to the end of the screw. According to Kudlacek, the "'325 patent specification neither discloses nor suggests that this arrangement is critical to the invention." Instead, argues Kudlacek, "[w]hat is critical to the invention is that the resilient pads are in contact with the adjustment member and the stabilizing rods to absorb vibrations–not that the resilient pads are mounted on the screws." However, as noted above, the only section of the patent describing the specific structure that performs the claimed function stresses the importance of the pad and screws working as a unit to resiliently engage and secure the adjustment member to the rods. Though Kudlacek now argues that he envisioned alternative structures not requiring the pad to be mounted to the screw, when drafting the '325 patent he purposefully invoked the *quid pro quo* of § 112, ¶ 6, and he cannot avoid the consequences of his choice. The disclosed structure consists of a pad mounted on the end of a screw, and Kudlacek did not disclose any alternative structures using a disembodied pad that would give broader scope to the resilient securing means limitation.

 Kudlacek also raises a claim differentiation argument based on the fact that dependent claim two recites attaching the resilient pad to the end of the screw. The doctrine of claim differentiation states that different claims should be presumed to have different scope, which "means that an interpretation of a claim should be avoided if it would make the claim read like another one." *Autogiro Co. of Am. v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 404, 155 USPQ 697, 708 (Ct.Cl.1967). However, claim differentiation only guides the court's interpretation of the claims, it does not command. As we noted in *Laitram Corp. v. Rexnord, Inc.,* "[a] means-plus-function limitation is not made open-ended by the presence of another claim specifically claiming the disclosed structure which underlies the means clause or an equivalent of that structure." 939 F.2d 1533, 1538, 19 USPQ2d 1367, 1371 (Fed. Cir.1991). Thus, claim differentiation will not be applied to a situation where, as here, a dependent claim recites the only structure disclosed in the specification that could correspond to the means claimed in the independent claim.

But even if the application of claim differentiation were appropriate in such a situation, the *doctrine* would not lead to a different result here, because claim two also contains other limitations that differentiate it from claim one even if the resilient securing means of claim one is construed to require the pad to be mounted to the screw. For example, claim two also requires that the screw and pad assembly "adjustably engage[ ]" the rod, and further requires that the pad and screw be "configured for releasable engagement with the stabilizer rod." Unlike claim two, claim one does not require that the resilient securing means be adjustable in the strength of its grip on the rod, and it does not require it to be releasable once engaged. Thus, reading the specification to require the pad to be mounted on the screw does not violate the doctrine of claim differentiation.

Because the patent only discloses performing the claimed function by using a pad mounted to a screw, the district court correctly concluded that the structure corresponding to the "resilient securing means" requires the pad to be mounted on the screw. However, the court did not end its interpretation of resilient securing means with its identification of the screw and the pad. Instead, the court interpreted the corresponding structure to require that the screw and pad possess a particular position and orientation with respect to

the adjustment member and the bores. *Kudlacek*, 115 F.Supp.2d at 1031. Specifically, based on an illustration of the preferred embodiment shown in Figure 2 of the '325 patent, *supra*, the court required the screw to be mounted on the adjustment member. This, in turn, meant that both the screw and the pad must be mounted to the adjustment member, because the pad is mounted to the screw. The court also concluded that, based on the description of the preferred embodiment, the screw and pad combination must be mounted "in registry with each through bore," which means that they must be mounted as shown in Figure 2—*i.e.*, in a channel that connects to the bore.

Kudlacek argues that the district court thus erroneously imported limitations from the preferred embodiment into the claims beyond what was necessary to construe "resilient securing means" under § 112, ¶ 6. We agree that the position and orientation of the set screw and pad assembly is not properly viewed as part of the structure corresponding to the "resilient securing means" limitation. However, we think that any error the court may have made in importing additional limitations regarding the orientation and position of the screws was harmless, because correctly construed, the claim language itself imposes a similar limitation on the position and orientation of the resilient securing means. In other words, the claim language contains a structural limitation on the position and orientation of the resilient securing means, *i.e.*, the screw and the pad. The claim requires that the means be "on the vibration dampener adjustment member extending into each of said openings." This language describes the position ("on the vibration dampener adjustment member") and the orientation ("extending into each of said openings") of the means. Citing Webster's, Kudlacek contends that "on" should take its normal dictionary definition of "[c]ontact with a surface, regardless of po-

sition." *Webster's II New Riverside University Dictionary* 820 (1988). However, such a definition of "on" is problematic because of the further limitation that the means "extend[ ] into each of said openings." In the context of this claim, "extending into" means that the securing means extends from one space into another—in this case, into the openings through which the rods pass. "Into" indicates "entry, introduction, insertion, superposition, or inclusion" as in "came into the house" or "enter into an alliance." *Webster's Ninth New Collegiate Dictionary* 634 (1985). Thus, extending into must mean that the securing means is partially outside and partially inside the opening, and thus extends from one location into the openings. A securing means that is *in* the opening does not extend into the opening from outside the opening. Furthermore, the natural reading of "on the vibration dampener adjustment member extending into said openings" is that the portion of the securing means that is not "extending into" the openings is "on the vibration dampener adjustment member." Thus, the claim requires that the resilient securing means, *i.e.*, the screw and the pad assembly, extend from a position on the adjustment member into the bores through which the stabilizer rods pass.

■ In conclusion, the district court correctly construed the resilient securing means to require a resilient pad mounted to the tip of a screw as described in the specification. Furthermore, the claim limitation "on the vibration dampener adjustment member extending into each of said openings," requires that the screw and pad extend from a position on the adjustment member into the bores.

## B

### Infringement Analysis

■ The key infringement issue before us is whether the Super Stix device con-

tains a "resilient securing means" that extends from the adjustment member into the bores. In light of our construction of the extending into limitation, even assuming arguendo that the Super Stix screw and O-ring combination meets the "resilient securing means" limitation of claim one, no reasonable jury could find that the Super Stix infringes, because the Super Stix "means" does not extend from the adjustment member into the bores.

It is undisputed that the Super Stix adjustment members contain screws that, when tightened, indirectly apply pressure to resilient O-ring pads. However, the Super Stix O-rings are not mounted on the set screws, but are wrapped around the rods, and the screws pass through the outer edges of the pieces of the adjustment member without ever touching the O-rings. Thus, the O-rings do not extend into the openings from a position on the adjustment member, as required by the claim. Rather, the O-rings are completely enclosed within the openings because they are wrapped around the stabilizer rods. Similarly, the Super Stix screws do not extend from the adjustment member into the bores, because they never reach, and indeed are not oriented in the correct direction to reach the bores. Indeed, one could think of the Super Stix resilient securing means as consisting of two separate components, one entirely within the adjustment member (the screws), and the other in the openings (the O-rings). However, since the two portions of the means do not physically connect, they do not, as a unit, extend from the adjustment member into the openings. Thus, the Super Stix cannot literally infringe claim one of the '325 patent as a matter of law.

Furthermore, the differences between the orientation of the screw and pad in the Super Stix and those of the claimed invention are too substantial to permit a finding of infringement under the doctrine of equivalents. The properly construed claim contains an express limitation that the resilient securing means extend from a position on the adjustment member into the bores through which the rods pass. The Super Stix contains absolutely no structure that could satisfy this orientation limitation. Neither the O-rings nor the screws, together or in isolation, can be said to extend into the bores. Therefore, to allow the arrangement of the Super Stix O-ring and screws to serve as an equivalent would write the orientation limitation out of the claim language. Such a result is impermissible as a matter of law. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424, 44 USPQ2d 1103, 1106 (Fed.Cir. 1997).

### III

For the reasons given above, we affirm the district court's judgment of noninfringement.

### COSTS

No costs.